## HALL *v.* THE STATE.

No. 9522.　OCTOBER 13, 1933.

*W. I. Geer,* for plaintiff in error.

*M. J. Yeomans, attorney-general, Robert B. Short, solicitor-general, J. T. Goree* and *B. D. Murphy, assistant attorneys-general,* and *W. H. Miller,* contra.

HILL, J. Sam Hall, having been indicted for the offense of

murder in Decatur County, was tried, convicted without recommendation to mercy, and sentenced to be electrocuted. He made a motion for a new trial on the general grounds and on a number of special grounds. His motion was overruled, and he excepted.

Miss Margaret Thompson was an eye-witness to the homicide and to the events leading up to it. According to her testimony, she and Dr. Herron were in his car on the way to her home. "Dr. Herron was lighting a cigarette, and the road was kind of rough, and the car cut a little toward the wagon. The mule kind of reared up a little bit, and as we passed the negro said something in a loud tone of voice to Dr. Herron. I did not hear him. Yes, sir, when we passed by the wagon he had pulled his car to the other side of the street. . . Dr. Herron asked me if I heard what he said. It said, no, I didn't hear it. He turned the car around, and said he was going to ask him what he said. He turned the car around and went back to where the negro was. The negro had stopped his wagon, and Dr. Herron got out of the car. I asked him not to get out. When he got out of the car it was parked near the wagon. The lights from the car were shining on the wagon. Yes, I could clearly and distinctly see the colored man and Dr. Herron. Yes, I could clearly see everything that was done. No, sir, I did not hear them engaged in a conversation. I did not hear what they were saying. I heard the conversation, but I could not tell just what they were saying. I heard the negro say, 'I don't have to take it.' He jumped off the wagon and knocked Dr. Herron down and fired then. He fired the gun. I saw the fire from the gun when he fired the shot. I jumped out of the car and started towards Dr. Herron, and the negro fired twice more. . . I started across the street and fell down, and Mr. Drinkwater drove up and I told Mr. Drinkwater that Dr. Herron had been shot. When I made the statement to Mr. Drinkwater that Dr. Herron had been shot, I did not make any statement with reference to the colored man, and I did not say anything about who shot Dr. Herron. After Mr. Drinkwater went to the colored man and asked him to drop his gun he came to where I was on the ground by Dr. Herron. Mr. Drinkwater said, 'Why did you shoot him?' He said, 'He shot me first.' I said, 'No, he didn't,' and he looked at me and said, 'I am sorry.' When the negro jumped off the wagon Dr. Herron's hands were folded like this, leaning against the wagon.

When the negro jumped on him he did not move his arms from this manner. Yes, Dr. Herron had a pistol underneath his belt and trousers on the left side. After the shot was fired, the colored man grappled with Dr. Herron. He immediately advanced towards him after he fired the shot. They were scuffling. Yes, sir, when Dr. Herron went over there, I know where he had his pistol. I did not see him place it in his belt. I saw it in his belt. I did not ever see Dr. Herron reach for his gun at any time before this man shot. I did not see him reach for it at all. No, sir, I did not see the doctor strike the colored man. . . When they went together Dr. Herron was on the left-hand side of the wagon. The negro jumped off facing him to the left. I think the wagon had a body. The negro was sitting on something. He was facing Dr. Herron. When he was talking to Dr. Herron he was facing him. When he first got there he was facing him. The negro was on the right of the wagon, sitting on the right, and Doc come up on the left-hand side of the wagon. The negro was sitting on something; don't know what it was. When the doctor walked up there, I did not hear what was said. I don't know how long he stayed there before they went to fighting. Just a few minutes. When they went together the horse and wagon left."

Dick Adams, a witness for the State, testified, in part: "I was with R. H. Drinkwater, a policeman, that night, doing patrol duty together. I saw Miss Margaret Thompson. When I first saw her she was running down the sidewalk on Washington Street, hollering. We saw a car parked in the road, and Mr. Drinkwater and I drove down and parked just behind it to the left. He got out and went to the sidewalk where the lady was hollering. I went to where Dr. Herron's car was standing. When I got there the lights were still on. I saw Dr. Herron lying in the road; so I went where he was at and I seen that he had been shot, and about the time I seen that he had been shot I hollered to Mr. Drinkwater that some one had killed him. About that time I saw the negro Sam Hall standing on the left-hand side of the road, just over the ditch. So I saw that he had two guns. I drew my guns on him and told him to throw his guns down. Mr. Drinkwater heard me talking to him. He threw the guns down, and Mr. Drinkwater picked them up and searched him and backed him in the lights of the car and held the defendant there."

R. H. Drinkwater testified: "I turned around and saw the boy and the negro, and I laid the woman down and pulled my gun and told the negro to throw the gun down. He looked at me and throwed it down. I taken the gun, Dr. Herron's, and put it in my scabbard and taken the negro's, the little one, and put it in my pocket. When I first saw the defendant he had two pistols in his hands, one in each hand, a bright pistol and a black pistol. Immediately after I seen him he dropped .the bright pistol. I heard a remark directed to him to cause him to drop the bright one; then I pulled my pistol and he dropped the other one, and that was the black pistol that belonged to Dr. Herron. The pistol which I call the bright pistol is the one I say is Sam Hall's pistol, the defendant." The witness also testified that Dr. Herron's pistol had a full load of six cartridges, that it had not been fired, and that the defendant's pistol had been fired three times; and further: "That pistol will weigh, I would say, a pound and a half. It is not loaded. Yes, sir, you could kill a man with that pistol if you were to throw the cylinder away; if properly used, it would be a deadly weapon without cartridges or cylinder. Yes, sir, if you hit a man over the head with it, you could kill him. It is a deadly weapon stripped of every cartridge and cylinder if properly used. It is a .38 caliber Colt, make about a 5-inch or 6-inch barrel, and it holds six balls. Yes, sir, when I got Sam Hall in the light that night he was pretty bloody. He had some blood on him bleeding from his face or somewhere. I did not see where he had been hit with something over his head. I did not look at any scar. Q. Where was the blood coming from that you saw running down on him? A. From his head. . . No sir, the whole side of his shirt, one side of his shirt or overalls was not bloody. Q. What about his shirt or overalls? A. He had blood on them. . . The blood was on his face and shirt. I don't know where it come from. I did not notice it that closely."

J. A. Womble testified that the pistol identified as Dr. Herron's weighed about four pounds, and that "you could take anything of that weight and beat a person to death." J. B. Donelson, for the State, testified: "I recall the night that Dr. Herron was killed. I was between 75 or 100 yards from the scene of the killing. After the shots were fired, immediately afterwards I saw the difficulty. It was as plain as day. The car was headed

south, and there were the street lights below that. What I saw, the tusselling I saw, was between the car lights and the street light. I saw them tusselling a few seconds, and saw them go down. After the shots fired, they stayed down a few seconds and the darkey got up and walked off across the street to the right. When I first saw it, they were scuffling. I was standing inside my room, looking out the window."

Charley King, for the State, testified as follows: "I live on Washington Street, and remember the occurrence when Dr. Herron got killed. I saw the difficulty. I was standing on the front porch when the shots were fired. The shots attracted my attention. I looked then. They were in a tussle. Doc had to get down, and the negro got on his knees, and then when I—he got on his knees, and the next thing he got up with two guns and walked over in the shadow of the trees. I heard three shots.

There was other testimony corroborative of the above. The defendant introduced no witness, but made the following statement to the jury: "I was on my way home that night, and so I met someone. I didn't know who was in the car, and the horse was rearing and jumping, and I asked those parties to let me have part of the road. I kept right on going. I made it on down home, and some one runs up on me, and who it was I didn't know, but they lammed me with a big pistol. So I grabbed at it, and in grabbing it I thought about mine; so I grabbed mine and commenced shooting to defend myself. I didn't know who it was. I was sorry after I found out who it was. It hurt me so bad after I found out it was my own friend, after he had been my friend many, many years. It made me feel so bad, him being my friend, and I couldn't realize who it was. So it hurt me when it come to me who it was."

■ The first special ground of the motion for new trial assigns error on the following charge by the court to the jury: "I charge you that if in the course of the case any evidence has been admitted for your consideration in the nature of incriminating admissions, I charge you that the law would have you scan all incriminating admissions with care and receive them with great caution." The criticism aimed at this charge is that (1) there was no evidence to authorize it; (2) it tended to impress upon the minds of the jury that the defendant had made incriminating

admissions; and (3) the court thereby intimated and expressed an opinion upon the facts in the case, telling the jury that the defendant had made such statements. There was evidence in the record which authorized the charge on incriminating statements; and a reading of the charge shows that it was not an expression of opinion as to what had been proved.

■ Ground 2 assigns error on the following excerpt from the charge to the jury (given after the court had given the definitions of murder, express malice, and implied malice, and of voluntary manslaughter, and explained the difference between murder and voluntary manslaughter): "If you find the defendant used the instrument described in the indictment and used it as set forth in the indictment, and it was a weapon likely to produce death when used in the manner you find it was used, then, if the accused was not justified, under some rule of law about which you have been or will be instructed in the court's charge, in the use of the weapon at the time he used it, if you find he did use it, then he would be guilty of murder or of voluntary manslaughter, according to whether the jury found that the act was done with deliberation or malice, either express or implied, or as the result of passion not brought about by words only." This is criticised as being an expression of opinion upon the facts of the case; because it obliterated from the jurors' minds the defense that the defendant was shooting to save his own life; because it restricted the defense of justification. The charge complained of was followed immediately by the words, "Of course, it being for the jury in all cases to determine whether or not he used any weapon, as set forth in the indictment." The charge is not subject to the criticism presented, as the court in another part of the charge dealt fully with the law of justification.

■ In ground 3 the following instruction is excepted to: "If you believe the defendant did shoot and kill the deceased as alleged in the bill of indictment, but if you believe he did so in defense of his own person against a violent assault sought to be inflicted upon him by the deceased, then you should acquit the defendant. If, upon all the facts and circumstances as they existed at the time of the homicide, this defendant as a reasonably courageous man believed it necessary to take the life of the deceased in order to save his own life or in order to prevent the

commission of a felonious assault upon his person, and in good faith acted under the influence of those fears, and not in a spirit of revenge, he would be justified." It is insisted that this instruction was error, because it eliminated from consideration of the jury the defense that the deceased was committing a battery upon the defendant; that in effect it was an instruction that if the homicide was committed by the defendant in resistance of a felonious assault being committed upon him by the deceased, it was essential to the justification of the defendant that it should also appear that the killing was not done in a spirit of revenge, thus confining the law of self-defense; that this part of the charge confused the law of section 71 of the Penal Code with section 70; that it eliminated from the consideration of the jury the fact that if the homicide was committed in resistance of a felonious assault actually being made upon the accused by the deceased with a deadly weapon, in order for the defendant to justify himself it would not have to appear that the killing was not done in a spirit of revenge. Counsel for the defendant does not quote the entire charge in this connection. The court also charged, following the excerpt quoted: "Although there was no actual assault or impending danger, if there were a seeming necessity to take human life, that is, if as a reasonably courageous man, under the facts and circumstances as they existed, or appeared to him to exist, the defendant believed his life was about to be taken, or a felonious assault was about to be made upon his person, and in good faith acted upon those fears, and not in a spirit of revenge, the defendant would be justified, though, as I have said, there was no actual or impending danger." The court had given in charge the law of murder, express and implied malice, had charged section 70 of the Penal Code on justifiable homicide, and had charged the law of voluntary manslaughter fully, as laid down in the Penal Code. The excerpt complained of, when taken in connection with the charge immediately following, was not erroneous.

It will be noted that the court charged the jury with reference to an "apparent necessity," that if the defendant "in good faith acted under the influence of those fears and not in a spirit of revenge, he would be justified, although there was no actual assault or impending danger; . . if the facts and circumstances appeared to him, as a reasonably courageous man, to exist, . . and he in

good faith acted on those fears and not in a spirit of revenge, the defendant would be justified, though there was no actual or impending danger." The court charged also the law of reasonable doubt. In grounds 6, 9, 12, 13, 14, 17, and 20 complaint is made in various forms that the court did not charge on the doctrine of apparent necessity and reasonable doubt in connection therewith, without any request therefor. The court did charge the law of apparent necessity and of reasonable fears; and there being no request for an elaboration of the charge on this subject, these grounds are without merit.

■ Ground 4 assigns error because the court, without any request, failed to charge: "The homicide appearing to be justifiable, the person indicted shall, upon the trial, be fully acquitted and discharged." Penal Code, § 76. The court charged fully the law of justifiable homicide. In *Holleman* v. *State,* 171 *Ga.* 200 (8) (154 S. E. 906) this court held: "The court having fully instructed the jury in regard to the law of justifiable homicide, it was not reversible error for the court to fail to give in charge to the jury section 76 of the Penal Code." See, to the same effect, *Jackson* v. *State,* 156 *Ga.* 842 (120 S. E. 535); *Hill* v. *State,* 164 *Ga.* 298 (5) (138 S. E. 229).

■ Ground 5 complains of the following charge: "No words, threats, menaces, or contemptuous gestures are sufficient to authorize one person to slay another solely because of the passion produced, without being guilty of the offense of murder." The criticism is that the evidence did not authorize this charge; that "words, threats, menaces, and contemptuous gestures may in some instances be sufficient to authorize one person to kill another," and therefore the language quoted was error; that this charge was immediately followed by the instruction: "Words, threats, and menaces may as a matter of law, under some circumstances, justify the fears of a reasonable man that a felony is about to be committed upon his person; and if you believe the accused was justified in so fearing, and acted under the influence of such fears and not in a spirit of revenge, the homicide would be justifiable." The plaintiff in error contends that the latter part of the charge was contrary to the first part, and laid down two different guides for the jury. This instruction was given in connection with the charge on voluntary manslaughter, and is a correct statement of the law. In

■

*Hartley* v. *State*, 168 *Ga.* 296 (147 S. E. 504), it was held: "In the absence of a timely and appropriate written request, it is not error, in charging upon the law of voluntary manslaughter as contained in section 65 of the Penal Code of 1910, to fail to qualify the statement that 'provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder,' by presenting also the principle that words, threats, or menaces, under the facts of the case might be sufficient to arouse the fears of a reasonable man that his person was in apparent danger of a felonious attack or that his life was in danger." Thus it appears that it is not erroneous for the court to fail to charge this principle in the absence of a timely written request therefor; so it could not be error to give this principle in charge, where applicable as in the present case. The complaint in this ground is without merit.

■ Ground 7 assigns error because the court did not instruct the jury, in the absence of a request, that if the jury believed from the evidence or the defendant's statement that a felonious assault was being committed upon the defendant by the deceased, he would be justified. The charge as given by the court on justifiable homicide was full and complete; and it was not error not to give a further charge on the subject.

■ Ground 8 complains of the following charge to the jury: "I charge you, if the assault upon the accused was made with a weapon likely to produce death and in a manner apparently dangerous to life, the fact that the accused may have provoked the assault by opprobrious words would not put him in the wrong for resisting it so far as was necessary to his defense." This charge was assigned as error, because (1) the court intimated and expressed an opinion upon the facts, and informed the jury that the accused provoked the assault by opprobrious words; (2) the charge was not authorized. This charge was authorized by the statement of the defendant, and by the evidence for the State, and is not subject to the criticism that it expressed an opinion on the facts of the case.

■ Ground 10 alleges error in that the court's charge on murder was contrary to the evidence and without evidence to support it, contending that the law of murder was not involved in the case at all, but that only the law of manslaughter and justifiable homicide was involved. This ground is but an elaboration of the gen-

eral grounds; and since a reversal of the judgment is to be ordered on another ground, this court will not now decide any question as to the sufficiency of the evidence to support the verdict.

■ Ground 11 assigns error because the court failed to charge, even without any request, that "All other instances which stand upon the same footing of reason and justice as those enumerated, shall be justifiable homicide." Penal Code (1910), § 75. Neither the evidence nor the defendant's statement authorized the court so to charge. *Brooks* v. *State,* 150 *Ga.* 732 (105 S. E. 362).

■ Ground 16 complains because the court failed to charge the jury, without any request: "If it should appear to you from the evidence in this case that the defendant was where he had a legal right to be, and was not at fault in bringing about any difficulty that may have occurred between himself and the deceased, and the deceased made an attack upon the defendant with a deadly weapon, the defendant was under no obligation to retreat, but had a legal right to stand his ground and defend himself against such an attack, so far as was necessary to accomplish his defense." The defendant introduced no evidence, but made his statement. The evidence did not authorize an instruction as just set out; and it was not error, in the light of the entire charge on the law of self-defense, to omit such instruction, in the absence of a request.

■ Ground 18 assigns error because the court failed to charge, without any request, as follows: "I charge you, when the circumstances are such as to excite the fears of a reasonable man, in the absence of all other proof to the contrary, the law will attribute the killing to such fears, and not to revenge or passion." The court charged fully the law of justifiable homicide and reasonable fears as applied to the evidence and the defendant's statement; and it was not error to further elaborate on this feature of the case, in the absence of a timely and proper request to do so.

■ Ground 19 assigns error because the court did not, without any request, charge in substance as follows: "The court charges you to look into the case as presented to you by the evidence, following the rules I have given you in reference to the weight and credibility you will give the defendant's statement; and if you should believe that the shooting was done by the defendant without malice and in the heat of passion arising from a mutual quarrel and a mutual intention to fight upon the part of the de-

fendant and the deceased; the court instructs you that if you believe such were the conditions, and if you should believe that the deceased was armed with a pistol and that the defendant was armed with a pistol at the time of the homicide and there was a mutual intention to fight, and that under such conditions the defendant shot and killed the deceased, then you would be authorized to find the defendant guilty of voluntary manslaughter; and if such intentions existed, both intending to fight, it would make no difference as to who struck the first blow, or as to who provoked the difficulty; the killing under such circumstances would be voluntary manslaughter." Under the evidence the jury could have found that at the time of the homicide the accused and the person killed were engaged in a mutual combat. The judge charged the jury generally upon the subject of voluntary manslaughter, but omitted entirely to charge the law of that offense as based upon the theory of mutual combat or mutual intention to fight. This omission was erroneous, and a new trial should have been granted on that ground. *Waller* v. *State,* 100 *Ga.* 320 (28 S. E. 77); *Findley* v. *State,* 125 *Ga.* 579 (3) (54 S. E. 106); *Clements* v. *State,* 140 *Ga.* 165 (2) (78 S. E. 716); *Wilson* v. *State,* 176 *Ga.* 198 (2) (167 S. E. 111). This division of the opinion merely expresses the views of the majority. Mr. Justice Gilbert and the writer dissent from the ruling just stated.

Ground 20 "excepts to the entire charge of the court as given on the law of murder, express and implied malice, voluntary manslaughter, justifiable homicide, reasonable doubt, and the statement of the defendant," etc. The criticism of the charge is exceedingly long, but also exceedingly vague as to any specific error: and inasmuch as a ground of a motion for new trial is required to point out some specific error, this ground will not be considered; although in the 21 special grounds of the motion each of the above principles of law as charged by the court, and by his failure to charge in some connection therewith, is dealt with, and herein ruled on. For the error pointed out in the next preceding division, the court erred in refusing a new trial.

*Judgment reversed. All the Justices concur, except Hill and Gilbert, JJ., who dissent.*