1. Although the killing occurred in December, 1939, the evidence relating to a threat made by the defendant in 1936, as set forth in the motion for a new trial, was not inadmissible on the ground of remoteness; nor was the evidence irrelevant, it appearing that the person slain was a police officer and that he so informed the defendant before he was killed, and the jury being authorized to infer that the threat so made by the defendant related to police officers as a class. Nor was the evidence subject to objection for other reason urged. See McDaniel v. State, 100 Ga. 67 (27 S.E. 158); Willingham v. State, 169 Ga. 142 (5) (149 S.E. 887); Ethridge v. State, 163 Ga. 186 (5) (136 S.E. 72); Frank v. State, 141 Ga. 243 (2) (80 S.E. 1016); Williams v. State, 152 Ga. 498 (110 S.E. 286).
2. The evidence relating to possession by the defendant of several guns and pistols, a cartridge belt, and ammunition was admissible for the limited purpose to which the judge in his charge restricted it, that is, for the purpose of "showing, if it does, the intent, scheme, design, purpose, and state of mind of the defendant." Burgess v. State, 93 Ga. 304 (4) (20 S.E. 331); Crumbly v. State, 141 Ga. 17
(80 S.E. 281); People v. Dale, 355 Ill. 330 (189 N.E. 269); 30 C. J. 160, § 376.
3. If a person kills "in self-defense, or in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on either; or against any persons who manifestly intend and endeavor, in a riotous and tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein," such homicide is justifiable. Code, § 26-1011. If the killing be not under the circumstances just stated, or other circumstances of justification (Code, §§ 26-1011 to 26-1017), but in the course of a rencounter in which the participants engage with a mutual intention to fight, the offense may be voluntary manslaughter as related to mutual combat. If the evidence, as distinguished from the prisoner's statement before the jury, authorizes an inference that the killing occurred in the circumstances last mentioned, it is the duty of the judge, even without request, to give in charge the law of voluntary manslaughter as related to mutual combat. Bailey v. State, 148 Ga. 401 (96 S.E. 862); Ison v. State, 154 Ga. 408 (114 S.E. 351).
4. Although in this case the deceased was a police officer, and the killing occurred in the home of the defendant, in the circumstances shown by the evidence it was a question for the jury as to whether they engaged in the recounter with a mutual intention to fight. The judge *Page 723 
charged the jury generally upon the subject of voluntary manslaughter, but omitted to charge the law of that offense as based upon the theory of mutual combat or mutual intention to fight. Such omission was erroneous, and for this reason a new trial should have been granted. Waller v. State, 100 Ga. 320
(28 S.E. 77); Hart v. State, 135 Ga. 356
(69 S.E. 530); Wilson v. State, 176 Ga. 198 (2) (167 S.E. 111); Hall v. State, 177 Ga. 794 (4) (171 S.E. 274).
5. There is no merit in the contention that the charge as given
placed upon the defendant the burden of proving that the deceased was the aggressor, and deprived the defendant of the law applicable to mutual combat.
Judgment reversed. All the Justices concur,except
JENKINS and DUCKWORTH, who dissent from the ruling in the fourth division of the decision.
 No. 13480. MARCH 15, 1941.
Ben Shafer was convicted of murder, and was sentenced to life imprisonment. The person killed was W. A. Frasier, a police officer of Fulton County. A motion for new trial after amendment was overruled, and the defendant excepted. He introduced no evidence, but relied upon cross-examination of the State's witnesses and upon his statement.
The evidence tended to show substantially the following: The defendant lived with his wife on Campbellton Road in Fulton County. He operated a store in a part of the building in which they resided. At the back end of this store was a bathroom and a combination kitchen and dining-room. On the morning of December 23, 1939, Frasier was instructed by Lieutenant W. A. Wells, of the Atlanta police force, to go to the home and place of business of the defendant and wait for Wells and other officers who were to come later with a warrant authorizing search for intoxicating liquors, the other officers being W. M. Riley, Cicero Adams, and B. B. Adams. Frasier was directed first to discard his uniform and put on civilian clothes, in order that the defendant might not know that he was a police officer. He was selected for this mission because it was believed that the defendant was not acquainted with him. The purpose of having him precede the other officers was that he might observe the conduct of the defendant and his wife on approach of the other officers with the search warrant, and to "block" them if they should endeavor to make way with any liquors that they might have in their possession. He was also instructed, if he could, to buy some whisky or beer *Page 724 
from the defendant before the arrival of the other officers. Frasier, after going by his own home and changing to civilian clothes, went to the home and place of business of the defendant as he had been directed to do by Lieutenant Wells. The search warrant had been obtained by officer Riley and remained in his keeping. Frasier himself had no warrant of any kind. Shortly after entering the store, he was shot and killed with a shotgun, in the hands of the defendant. As to what happened immediately preceding, the State offered one witness, a man named Latham, who testified that he lived on a farm near Fairburn, and in passing had stopped at the defendant's store on this occasion. With him was a man named Terry, who it seems was not accessible as a witness. Latham testified as follows: He was in the store at the time Frasier appeared. Frasier asked Shafer for a bottle of beer. Shafer stated that he did not sell beer. Frasier then asked for a coca-cola and a box of aspirin. These having been supplied, Frasier asked for a glass of water. Shafer stated that his wife would bring the water, and Mrs. Shafer immediately went into the bathroom for this purpose. She had to go through the kitchen in order to reach the bathroom. Frasier followed her, and was right at the bathroom door when she started to close the door. "When Mrs. Shafer started to close the bathroom door Mr. Frasier put his foot against it and tried to keep her from closing it. While Frasier was thus holding the door open, Mrs. Frasier called to her husband, "Ben! Benny!" When he "got back there where Mr. Frasier was he grabbed him by the coat and started to turn him around. . . Mr. Shafer grabbed him, and they were sort of scuffling, and Mr. Frasier said, `I am a policeman.' . . Regarding where Mr. Shafer was at the time Mr. Frasier made the remark that he was a policeman, — Mr. Frasier pushed him against a table. Mr. Frasier came out with something in his hand. I could not see what it was. He made an overhand lick at him, and I left at that time. He struck at him. They were in the kitchen when that happened. Regarding where Mrs. Shafer was at that time, — I left out. She was still at the door when he grabbed him. . . We went on toward home. We did not meet or see two police cars. I did not see the police when they came up. I had already gone. . . Mr. Frasier had his foot against the door to the bathroom. Mr. Shafer grabbed him this way [illustrating]. *Page 725 
Then Mr. Frasier pushed Mr. Shafer back. He pushed him this way [illustrating]. I see a table in this picture. The table was there at that time. That is the table that I saw Frasier push Shafer against after he turned him around, jerked him around. I did not wait there to see what Shafer did after he had been pushed against the table."
Lieutenant Wells and the other officers proceeded to the defendant's home and place of business about three minutes after Frasier left them for that purpose, and on arrival they found Frasier lying on the floor near the point where he had been last seen by the witness Latham. A portion of the top of his head had been shot off, and his service pistol was lying eighteen or twenty inches from him, with one cartridge discharged. A corresponding bullet had lodged in a cabinet near by, and several glass objects in the cabinet had been shattered. A ten-gauge shotgun with one shell discharged was lying on a bed, and it was admitted by the defendant that he killed the deceased with this gun. According to the evidence of Lieutenant Wells and the other officers, the defendant made to them substantially the following statement at the scene of the homicide: The man came in and tried to kill him. He thought at first that the man was going to rob him. When Mrs. Shafer called to the defendant from the bathroom, he went into the bathroom and found her getting up off the floor. Frasier hit the defendant with a blackjack, and then stepped back and shot at the defendant one time. The defendant then got his gun and shot the deceased. The defendant further stated that at the time he shot the deceased, the latter was aiming his pistol directly at him. The defendant had a wound or bruise upon his forehead, as to which Lieutenant Wells testified: "I saw evidence of him being hit with a blackjack. I saw the place right here in his forehead. I saw him take his handkerchief out and wipe it like that. I saw blood on his shirt." A blackjack owned by the deceased was found in the outside pocket of the overcoat which the deceased had on at the time he was killed. The fingers on the right hand of the deceased had flesh wounds upon them, and were bloody. Apparently they were in the line or path of the shots that were discharged from the gun of the defendant. The pistol of the deceased, however, had no sign of blood upon it, and showed no evidence of having been struck by any of the shots *Page 726 
fired from the defendant's gun. In the bathroom, the officers discovered a glass containing less than a spoonful of whisky. They testified that there was a strong odor of whiskey in the bathroom and in other parts of the building. The defendant's statement to the jury coincided generally with that which he made to the officers on the day of the homicide.
It appeared from the evidence that the defendant's place had been searched by officers for intoxicating liquors in the year 1936, and on the instant trial the State, over objection of the defendant, introduced evidence of a threat made by the defendant at that time. On the day of the homicide, December 23, 1939, the officers found two army rifles and three pistols, besides the gun with which the deceased was shot. They found also a canvas cartridge belt with cartridges suited to the army rifles, besides some other ammunition. All of these guns, the belt, and the ammunition were introduced in evidence. The evidence regarding them and the physical objects themselves were admitted in evidence over objection of the defendant. There was testimony to the effect that no such guns or articles were found at the time of the search in 1936.
Special ground 1 complained that the court erred in admitting the following testimony of W. M. Riley, one of the officers who testified as a witness for the State: "I saw Ben Shafer in 1936. I saw him on the 6th day of October, 1936. He did make a threat at that time. In October, 1936, Ben Shafer was living on the right of Campbellton Road below Ben Hill at the same place where Mr. Frasier was shot. I went to this same place where Mr. Frasier was shot. I went to this same place in October, 1936, with Lieutenant Wells, B. B. Adams. Ed McGill and — I am not sure — one other policeman, I think Mr. Clay, and myself. I am not sure. We drove up in front of Shafer's place. I jumped out of the automobile, and was the first that went in the place. As I went through the store Mrs. Shafer ran to the bathroom and slammed the door to. I ran against the door, which was fastened. Mr. Shafer grabbed me by my right shoulder and snatched me around, and as he pulled me around Mr. B. B. Adams pulled him away from me. Mr. McGill got there and he and I ran against the door and broke the lock. . . As I came out of the bathroom Ben Shafer said, `I'm going to shoot some of *Page 727 
you smart policemen, you sons of bitches, running in here and snatching my wife and pulling her around.'"
In ground 4, the movant complained of the admission of similar testimony of another witness. In each instance the evidence was objected to on the grounds that it was irrelevant and immaterial; that the threat if made as claimed was too remote; that there was no evidence that the defendant knew that officer Frasier, the deceased, was a policeman at the time of the altercation or that any threat was ever made by the defendant against the deceased; that the testimony tended to put the defendant's character in issue, and that it related to a separate and distinct transaction, and could throw no light upon any issue involved in the present case.
Grounds 2, 3, 5, 6, 7 and 8 complained that the court erred in admitting testimony of the extra guns, pistols, and ammunition found by the officers; and in admitting in evidence the objects themselves, over objection that the evidence was irrelevant and immaterial, could throw no light on the guilt or innocence of the defendant, and was highly prejudicial.
Regarding the evidence referred to in grounds 1 to 8, the judge charged the jury as follows: "Gentlemen, certain evidence has been offered in this case relating to alleged threats made at a previous time against policemen as a class. This evidence can not be considered by you at all, except for a very limited and restricted purpose, namely, to illustrate, if it does, the scheme, design, purpose, intent, and state of mind of the defendant towards a particular class, to wit policemen; and even then it can not be considered by you unless you believe beyond a reasonable doubt that the fact of the deceased being a policeman was communicated to the defendant, and the defendant had knowledge of the deceased being a policemen at the time of the killing and before the act was committed. Certain evidence has been admitted relating to the possession by the defendant at the time of the homicide of certain weapons alleged to be deadly weapons. You are instructed that you should not consider this evidence in any manner whatsoever except for the limited and restricted purpose of showing, if it does, the intent, scheme, design, purpose, and state of mind of the defendant; and it is a question for the jury to determine whether the possession, if it existed, of such weapons does illustrate the *Page 728 
intent, scheme, design, purpose, and state of mind of the defendant. If the jury believes that threats were made, such as I have just referred to, these facts, if they exist, should not be considered as putting the defendant's character in issue in any manner whatsoever, but they may be considered by the jury, if they believe them to have existed, as circumstances bearing upon the question of intent, scheme, design, purpose, and state of mind of the defendant; and the rule with reference to circumstantial evidence heretofore given you is applicable to this class of evidence."
In grounds 9 and 10 it was contended that the court erred in failing to charge the jury on the law of voluntary manslaughter as related to mutual combat or mutual intent to fight. Ground 11 complained of a charge relating to voluntary manslaughter, on the contention that it placed upon the defendant the burden of proving that the deceased was the aggressor and deprived the defendant of the benefit of the law applicable to mutual combat.