## 38749. WALRAVEN v. THE STATE.

SMITH, Justice.

Appellant, James Samuel Walraven, was convicted of the "bathtub" murder of Gisele Clardy and sentenced to death. Finding four of appellant's enumerations of error to be meritorious, we reverse.

### Facts

Gisele Clardy was employed as assistant manager of the Cherry Hill Apartments in DeKalb County. On the afternoon of May 28, 1981, Gisele left her office to post certain notices and to inspect vacant apartments. James Buffington, an auto mechanic working in the parking lot near building "U," saw Gisele drive into the parking lot shortly after 4:00 p.m. Behind her was a car with two men inside. Both cars parked. The passenger, whom Buffington later identified as the appellant, James Walraven, got out and talked briefly with Gisele. Both walked out of sight toward building U. Ten or fifteen minutes later, appellant ran back to the car, got in, and departed.

Gisele did not report to work the next day. Her body was discovered that morning in apartment U-1, lying face down in the bathtub in three or four inches of water. She was nude except for her blouse. Cause of death was strangulation. No sperm or seminal fluid was discovered during the autopsy, but bruises and contusions around her vagina indicated that she had been sexually attacked.

The state contended at trial that the murder of Gisele Clardy was one of a series of similar crimes. In support of its contention, the state offered the following evidence.

Margaret Finnerty resided at Windermere Apartments on Roswell Road. On March 3, 1981, a man claiming to be a maintenance man knocked on her door and asked to be admitted so he could check her water. Mrs. Finnerty opened the door and the man, whom she later identified as the appellant, choked her with a kerchief or bandana until she passed out.

On March 16, 1981, a man in a tan uniform, wearing black gloves and carrying a flower box under his arm, rang the doorbell to Constance Harrold's home. When she opened the door, the man stated, "I have a delivery for Mrs. Robinson." Then he tried to force

his way into the home. Mrs. Harrold managed to close the door, run out the back, and call the police at a neighbor's house. The flower box was caught in the door. No flowers were inside, but when the police arrived they discovered a coil of rope lying on her front porch.

A man who jogged in the area resembled the description given by Mrs. Harrold to the police. Based upon her identification of this man, he was arrested, but was later released when Mrs. Harrold decided she had identified the wrong man. Subsequently, Mrs. Harrold identified appellant as the man who had assaulted her.

On April 15, 1981, Dario Dal Santo found the body of his sister, Louise, lying face down in the bathtub of the Woodcreek apartment where the two of them resided. She was nude. Sperm was discovered in her vagina and mouth. Cause of death was manual strangulation. A pubic hair recovered from the bath rug was compared with a sample later taken from appellant. The two hairs were sufficiently similar that they could have had a common origin. The semen sample obtained from Louise's body was examined as was a sample of appellant's blood. Appellant could not be eliminated as donor of the seminal fluid.[1]

On the afternoon of June 5, 1981, Meredith Nelson saw appellant in the hallway near her Windermere apartment. She followed him downstairs. When she stopped to check her mail he told her, "I just thought I'd let you know I was in your apartment earlier today . . . I was working on your pipes."

On June 15, 1981, the body of Patricia Berry, who had lived across the hall from Meredith Nelson, was discovered face down in her bathtub, partially submerged in water. She was nude above the waist. Cause of death was manual strangulation. Joseph Gann saw a man sneaking around the corner of the apartments about 2:15 p.m. of June 15. This man, Gann testified, was about 6'1" or 6'2" with blondish hair, had a good tan, looked very strong, and was wearing a gold medallion around his neck. Gann was 70 to 80% sure that the man he saw that day was the appellant, James Walraven.

Appellant was arrested July 14, 1981, and interrogated. During the interrogation, appellant stated that "the only person he had ever had sex with in his life was his sister," some years before.

David Zorda, a convicted forger and a prisoner at the Henry County jail at the time of the trial, testified that in July of 1981 he was incarcerated in the DeKalb County Jail. On July 24, 1981, he and appellant were the only white inmates at the jail store and talked

---

[1] Approximately 12% of the male population could be eliminated as possible donors. Appellant was not one of that 12%.

together briefly. Appellant told Zorda that he had "killed those goddamn bitches."

After the state rested appellant presented his case.

Martha Delagarza lived at Cherry Hill apartments, where Gisele Clardy had worked. About a week before Gisele was killed, Martha was followed home by a strange man in a telephone van. When she turned left into the apartment complex, he passed her, made a u-turn, and followed her all the way to building U, where she lived. The driver was a large, muscular looking man with straw-colored hair. She testified that he was not the appellant, James Walraven.

Dr. Richard Rasche, a clinical psychologist, testified that at the request of the DeKalb police, he placed James Buffington (the mechanic who had seen appellant with Gisele Clardy on the afternoon of her death) under hypnosis, in an attempt to heighten his recall of the events of that afternoon. Under hypnosis, Buffington stated that the man he saw talking to Gisele was only a couple of inches taller than she and was wearing a watch on his right wrist. Buffington recalled seeing a telephone company van parked nearby.

On the afternoon of March 16, 1981 (the day Constance Harrold was attacked), Helen Whitehead was working at a house up the street from Mrs. Harrold's residence. Ms. Whitehead testified that a man came to the door and asked for a coathanger to unlock his car. She described the man as being in his late 20's, having blond hair, and wearing a beige jumpsuit. A long white box was sitting on top of his car. She testified that the man she saw was not the appellant, James Walraven.

Peggy Brodsky, the manager of Glenlake Tennis Center, testified that on April 15, 1981 (the day Louise Dal Santo was killed), appellant manned the phones at the tennis center from 4:00 p.m. to 10:00 p.m.

Jonathan Linton testified that he saw appellant at Blackburn Park between 4:15 and 4:30 p.m. on June 15, 1981 (the day Patricia Berry was killed). He and appellant warmed up together and both played in a tennis tournament later that evening.

Robert Melton, commander of the jail division of the DeKalb County Sheriff's Department, testified that David Zorda spent approximately three days in the DeKalb County Jail and that Zorda and appellant were both in the jail store on July 24, 1981, and no other time. They both would probably have been placed in the same holding area of the store.

Wayne Krier[2] testified that he was the "house man" for the

---

[2] See *Krier v. State,* 249 Ga. 80 (287 SE2d 531) (1982).

"Northeast Max" cell block of the DeKalb County Jail. Appellant was incarcerated in the same cell block. Krier testified that during the first six weeks of appellant's incarceration, appellant never went to the store without Krier being present. Krier never saw appellant talking to David Zorda and never heard appellant confess to Zorda or anyone else.

G. L. Smith, an investigator with the DeKalb County Police Department, testified that he searched appellant's apartment on July 14, 1981, and found nothing that connected appellant with Gisele Clardy's murder or any other crime.

Appellant testified on his own behalf. He denied being at the Cherry Hill Apartments on May 28, 1981, and claimed he had not been there in over three years. He testified that he is right-handed and wears his watch on his left wrist. He testified that he never wore any other jewelry, including medallions. He never saw David Zorda until the latter testified; he did not know the whereabouts of Windermere Apartments; he did not own a car; and he did not kill Gisele Clardy, Louise Dal Santo, or Patricia Berry, or attack Mrs. Finnerty or Mrs. Harrold.

1. In his tenth enumeration of error, appellant contends the trial court erred in refusing to hear the challenge to the array of the grand jury.

Rule II (A) (5) of the Unified Appeal Procedure states that at the "first proceeding," which is to be held at "the earliest possible opportunity after indictment and before arraignment," "[t]he court shall determine whether or not the defendant intends to challenge the arrays of the grand or traverse juries ... If a challenge is presented, the court shall hear the asserted factual and legal basis of challenge although under law the right to challenge may have been waived."

The first proceeding in this case was conducted September 10, 1981. In response to the court's query, counsel for appellant stated that he needed additional time to complete his investigation to determine whether or not any jury challenge would be appropriate. The state responded that it was satisfied with this preliminary statement, so long as appellant gave a definite answer at the time of the motion hearing. See Rule II (B). The court allowed appellant additional time to answer the question.

Appellant filed his challenge to the arrays of the grand and traverse juries on September 25. On September 28, the court granted appellant's motion for continuance with regard to his motion to change venue and his jury challenges.

The court convened October 16, 1981, for the purpose of hearing appellant's challenges to the arrays of the grand and traverse juries. At this hearing, the state, for the first time, contended that since the

challenge to the array of the grand jury had not been filed prior to the indictment, the challenge was waived. See, e.g., *Sanders v. State,* 235 Ga. 425, 426 (219 SE2d 768) (1975). The court agreed, ruled that the challenge to the array of the grand jury was untimely, and refused to allow appellant to make an offer of proof with regard to the merits of his challenge.

We agree with appellant that the purpose of Rule II (A) (5) of the Georgia Unified Appeal Procedure is to allow a defendant in a death penalty case to challenge the array of his grand jury after indictment.[3] Failure to announce at the first hearing that defendant does, in fact, intend to challenge the array of the grand jury might ordinarily bar a subsequent challenge. In this case, however, the court allowed appellant additional time to determine whether or not to make such a challenge. We conclude, therefore, that no waiver occurred.

The trial court erred in refusing to hear the merits of appellant's grand jury challenge.[4] We must remand this case to the trial court with direction to conduct a hearing on appellant's challenge to the array of the grand jury. Since the grand jury that indicted appellant was selected prior to the release of the final, official 1980 census, the validity of the composition of the grand jury shall be determined by reference to the 1970 official decennial census. If the grand jury challenge is meritorious, the indictment must be quashed and a new indictment obtained from a proper grand jury, selected by reference to the now released official 1980 decennial census.

2. Appellant contends in his seventh enumeration of error that the trial court erred in allowing David Zorda to testify about appellant's statement made to Zorda while both were in police custody at the DeKalb County Jail, because the state failed to comply with Code Ann. § 27-1302 by furnishing appellant with the statement at least 10 days prior to the trial of the case. We agree.

Code Ann. § 27-1302 provides in part: "The defendant shall be entitled to have a copy of any statement at least 10 days prior to the trial of the case given by him while in police custody . . . Failure of the prosecution to comply with a defendant's timely written request for a copy of his statement, whether written or oral, shall result in such

---

[3] We need not consider appellant's alternative argument that, since the state had led him to believe that the bill of indictment was going to be presented two or three weeks later than it actually was, the failure to file a pre-indictment challenge was excusable.

[4] Even if we agreed that a waiver had occurred, we note that the Unified Appeal procedure requires the trial court to "hear the asserted factual and legal basis of challenge although under law the right to challenge may have been waived." Rule II (A) (5), supra.

statement being excluded and suppressed from the prosecution's use in its case-in-chief or in rebuttal."

On September 16, 1981, appellant filed a ". . . Motion for Discovery pursuant to Ga. Code Sections 27-1302 and 27-1303 requesting that the state make the following available to him: (1) Any statement given by defendant while in police custody, whether written or oral . . ." Appellant was arraigned November 9, 1981, and the case was tried November 9 through November 16.

Appellant's request was both timely and sufficiently specific. *McCarty v. State,* 249 Ga. 618 (292 SE2d 700) (1982); *State v. Meminger,* 249 Ga. 561 (292 SE2d 681) (1982).

The state argues that since the statement made by appellant to Zorda was not the product of custodial interrogation, Code Ann. § 27-1302 is inapplicable. We cannot agree. The statute plainly refers to "any statement . . . given by [the defendant] while in police custody." See *Reed v. State,* 163 Ga. App. 364 (295 SE2d 108) (1982).

The state does not contend that the statement was newly discovered, nor is there any indication in the record that appellant had notice, until just before the testimony was offered, that the state intended to prove the statement. It should have been excluded. Moreover, since the statement was direct evidence of appellant's guilt in a primarily circumstantial case, we cannot conclude its admission was harmless. Compare *Wallin v. State,* 248 Ga. 29 (279 SE2d 687) (1981). Thus, even if, on remand, appellant's grand jury challenge is found to be without merit, a new trial is necessary. If, on retrial, Code Ann. § 27-1302 has been complied with, Zorda's testimony will be admissible. *Tanner v. State,* 160 Ga. App. 266 (287 SE2d 268) (1981).

3. Since this case must be retried, we need not determine whether or not appellant's traverse jury challenge was meritorious. However, since the trial court measured disparity incorrectly and since appellant might, upon retrial, file a new traverse jury challenge, we point out that where a defendant makes a Sixth Amendment fair-cross-section attack upon the composition of the traverse jury, "the fair-cross-section requirement involves a comparison of the makeup of jury venires or other sources from which jurors are drawn with the makeup of the *community,* not of the voter registration lists." Duren v. Missouri, 439 U. S. 357, 365, n. 23 (99 SC 664, 58 LE2d 579) (1979). Moreover, "the fair cross section analysis employs a prima facie test which is virtually identical to the equal protection prima facie test for establishing a presumption of discrimination. [Cits.] There is a significant distinction, however, in the way that each prima facie case may be rebutted. For an equal protection claim, the presumption can be rebutted by proving an absence of

discriminatory intent. [Cit.] In a fair cross section analysis, purposeful discrimination is irrelevant since the emphasis is purely on the structure of the jury venire; a prima facie case can be rebutted only by establishing a significant government interest which justifies the imbalance of classes. [Cit.]" United States v. Perez-Hernandez, 672 F2d 1380, 1384, n. 5 (11th Cir. 1982).

4. We find it necessary to deal with other errors that might otherwise occur upon retrial:

(a) Appellant's third enumeration of error is meritorious. The trial court failed to specifically rule that appellant's statements made during custodial interrogation were voluntary.

In Sims v. Georgia, 385 U. S. 538 (87 SC 639, 17 LE2d 593) (1967), the U. S. Supreme Court held that while "the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." "As in Sims, here there has been no ruling on the issue of voluntariness made with the required 'unmistakable clarity.' " Cofield v. State, 247 Ga. 98, 109 (4) (274 SE2d 530) (1981).

(b) Appellant's fourth enumeration of error is meritorious. Appellant contends the trial court erred in allowing a witness for the state to testify that during custodial interrogation, appellant stated that "the only person he had ever had sex with in his life was his sister." Appellant contends this testimony was irrelevant, attacked his character and introduced evidence of another crime,[5] separate and independent of the one for which he was being tried.

Even if character is not one of the ultimate issues in the case, character evidence is logically relevant: "Character is circumstantial evidence of conduct and state of mind . . . A person is more likely to act in accord with his character than contrary to it." Waters v. State, 248 Ga. 355, 366 (283 SE2d 238) (1981) (cites omitted). Nonetheless, because the probative value of such evidence is outweighed by the danger of prejudice, such evidence is generally legally irrelevant. Code Ann. § 38-202. A specific application of the general rule is that in criminal cases, "no evidence of general bad character or prior convictions shall be admissible unless and until the defendant shall have first put his character in issue." Code Ann. § 38-415. However, if "the evidence is substantially relevant for some other purpose than to show a probability that [the defendant] committed the crime on trial because he is a man of criminal character," McCormick on Evidence, § 190 at 447 (2d Ed. 1972), it is admissible even if it incidentally puts the defendant's character in issue. Tiller v. State, 196 Ga. 508 (3) (26

---

[5] Incest is a felony. Code Ann. § 26-2006.

SE2d 883) (1943).

Purposes for which evidence of previous criminal acts might be offered, other than to show criminal character, include: Motive; intent; absence of mistake or accident; plan or scheme, of which the crime on trial is a part; and identity. McCormick, supra; *Hamilton v. State,* 239 Ga. 72 (235 SE2d 515) (1977). Thus, in certain circumstances, evidence of independent crimes is admissible. Two conditions must be satisfied. "First, there must be evidence that the defendant was in fact the perpetrator of the independent crime. Second, there must be *sufficient similarity* or *connection* between the independent crime and the offense charged, that proof of the former tends to prove the latter." *French v. State,* 237 Ga. 620, 621 (229 SE2d 410) (1976). (Emphasis supplied.)

The alleged incest is not similar to the crime for which appellant was tried. This the state concedes, but contends that it shows motive and state of mind and is therefore logically connected even if dissimilar. We cannot agree.

"The state of mind that will permit the admission of an unrelated crime is the state of mind at the time of the commission of the offense as shown by the acts or words of the defendant so close in time to the alleged offense as to have a bearing upon his state of mind at that time. Defendant's conduct over the years cannot be shown to prove that he has a depraved or wicked state of mind generally." Commonwealth v. Boulden, 116 A2d 867, 873 (Penn. Super. Ct. 1955).

Nor can we agree that evidence of an incest occurring years ago illustrates motive for committing a "bathtub" murder. See *Larkins v. State,* 230 Ga. 418 (2) (197 SE2d 367) (1973).

In our view, the only relevance of the evidence was to show bad character or criminal propensity. Absent the injection of the issue of character into the case by the defendant, such evidence is inadmissible.

(c) In reviewing the sentencing charge of the court, we have noted that the court failed to clearly and explicitly instruct the jury about the nature or function of mitigating circumstances. *Hawes v. State,* 240 Ga. 327 (9) (240 SE2d 833) (1977); *Fleming v. State,* 240 Ga. 142 (7) (240 SE2d 37) (1977). See Spivey v. Zant, 661 F2d 464 (5th Cir. 1981). Compare *Horton v. State,* 249 Ga. 871 (8) (295 SE2d 281) (1982); *Johnson v. Zant,* 249 Ga. 812 (2) (295 SE2d 63) (1982).

*Judgment reversed. All the Justices concur, except Weltner, J., who dissents. Bell, J., not participating.*

DECIDED NOVEMBER 23, 1982 —
REHEARING DENIED DECEMBER 14, 1982.

*Richard M. Loftis, Michael E. Hancock,* for appellant.

*Robert E. Wilson, District Attorney, Jonathan C. Peters, Assistant District Attorney, Michael J. Bowers, Attorney General, Virginia H. Jeffries, Staff Assistant Attorney General,* for appellee.