### 74523. CARVER v. THE STATE.
(364 SE2d 877)

McMURRAY, Presiding Judge.

Defendant was indicted for the offense of a terroristic threat. The evidence adduced at trial, construed most favorably to support the jury's verdict, was as follows:

Defendant is the "Great Titan" in an organization known as the "Ku Klux Klan." In his leadership capacity with this association, defendant organized a demonstration through a series of tape recorded messages of a political and racial commentary which were transmitted to interested persons by a telephone answering machine. Pursuant to his efforts, defendant assembled a group of followers on March 22, 1986, in the parking lot of "the Georgia Mountain Center in Gainesville[, Georgia]," where he and his associates clothed themselves in long white robes and tall white conical shaped hats. Defendant then directed the group to a location in the vicinity of Atlanta Street and Sycamore Street in Gainesville, Georgia. While marching to the locus of the demonstration, some of the demonstrators carried placards. Defendant carried a non-functional "replica of a Thompson sub-machine gun . . ."

After the protesters arrived at the designated demonstration area, defendant disposed of the "submachine gun" replica and began encouraging his followers in their cause. Soon thereafter, a large group of people, which included local residents and vendors, gathered in the area of the demonstration. A number of people outside the KKK demonstration became agitated as a result of the demonstrators' activities; and, despite the presence of a large contingent of law enforcement officers, derogatory comments were exchanged between the opposing groups.

The victim, a businessman, arrived in the area of the demonstration at about 12:00 to open his place of business. The victim observed the hostile environment and, in an attempt to relieve the tension, the victim approached defendant and asked him to lead the protesters from the area. Defendant did not comply, the demonstration continued and the victim withdrew. A few moments later, the victim ap-

proached defendant and said, " 'Why don't you go ahead and leave because the people done got angry and I'm scared they are going to start a riot.' " In reply, defendant told the victim to " '[g]et back or I'll shoot, I'll shoot . . .' " and "[defendant's] hand went down in his right-robe area." The victim then "backed up and began to yell at the policemen that [defendant] had a gun."

From this and other evidence adduced at trial, defendant was found guilty of the offense of a terroristic threat. Defendant appeals. *Held*:

1. In his first two enumerations of error, defendant contends the trial court erred in quashing his subpoenas for the production of documents directed to various law enforcement agencies and to Southland Publishing Company, d/b/a *The Times*. In this regard, defendant argues that photographs relevant to his plea of "self-defense and provocation" were improperly withheld from discovery. Defendant also argues that photographs were withheld which were necessary for impeaching the State's witnesses.

In response to the State's and *The Times*' motions to quash defendant's subpoenas, the trial court ordered the State and *The Times* to produce to the court for an in camera examination all of the photographs requested by defendant. However, the trial court limited *The Times*' burden of production to "all photographs showing defendant and [the victim] or either individual separately [and allowed *The Times*] to exclude any photographs taken after the arrest of defendant . . ." The State and *The Times* complied and, after an in camera inspection of these materials, the trial court provided defendant four photographs produced by the State for use at trial and found that none of the photographs produced by *The Times* were "relevant or material to the stated defense of self-defense."

" '(T)he appellant has the burden of showing he was denied material exculpatory information such that he was denied a fair trial.' *Kilgore v. State*, 251 Ga. 291 (5) (305 SE2d 82) (1983). If the trial court performs an in camera inspection and denies the defendant access to certain information, on appeal the appellant has the burden of showing both the materiality and the favorable nature of the evidence sought. *Welch v. State*, [251 Ga. 197 (8) (304 SE2d 391]. Mere speculation that the items the appellant wishes to review possibly contain exculpatory information does not satisfy this burden. Id." *Williams v. State*, 251 Ga. 749, 789 (312 SE2d 40).

In the case sub judice, defendant has failed to show that any relevant or exculpatory photographs remain in the State's files or *The Times*' records. He merely asserts that such photographs may exist and that his examination of all of the photographs in the State's files and *The Times*' records is necessary to satisfy his discovery request. We do not agree.

It is undisputed that *The Times* produced *all* photographs in its records depicting defendant or the victim for the in camera inspection. It is also undisputed that the State produced all photographs of the demonstration in its records for the in camera inspection. Contrary to defendant's assertions, we find any photographs not depicting defendant or the victim irrelevant to defendant's defenses to the offense of a terroristic threat or for the purpose of impeaching the State's witnesses. Consequently, these enumerations of error are without merit as the photographs produced by the State and *The Times* were sufficient to satisfy defendant's discovery request. Further, we find that the trial court's in camera inspection procedure was an appropriate method of determining the relevance of this evidence at trial. See *Byrd v. State*, 171 Ga. App. 344, 345 (3) (319 SE2d 460) and *Jinks v. State*, 155 Ga. App. 925 (2) (274 SE2d 46).

2. Defendant contends in his third enumeration of error that the trial court "erred in not reprimanding the District Attorney for misstating the evidence to the jury in closing argument."

"We reject this argument because it is well-settled that a sustained objection to improper argument of counsel cannot serve as the basis for reversal unless it is contemporaneous with a denied motion for mistrial, denied request to strike or denied request for curative instructions, none of which were made [by defendant's counsel] below. See *Williams v. State*, 156 Ga. App. 17 (1) (274 SE2d 71) (1980); *Carroll v. State*, 147 Ga. App. 332 (7) (248 SE2d 702) (1978); *Favors v. State*, 145 Ga. App. 864 (2) (244 SE2d 902) (1978)." *Keen v. State*, 164 Ga. App. 81, 88 (7) (296 SE2d 91).

3. Next, defendant contends the trial court "erred in denying [his] motion to dismiss for selective prosecution."

"In *United States v. Berrios*, [501 F2d 1207 (2d Cir., 1974)], the court said, 'To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights . . .'' '' William W. Daniel, Ga. Criminal Trial Practice (1985 ed.) § 21-21.

Applying this principle in the case sub judice, we find no basis to support a claim for selective prosecution. There is no evidence showing that others committed the crime of a terroristic threat during the demonstration and there is no evidence indicating that the prosecution of defendant was undertaken for a retaliatory purpose. This enumeration of error is without merit. See *Sabel v. State*, 250 Ga. 640,

643 (300 SE2d 663); and *Lee v. State*, 177 Ga. App. 698, 699 (1) (340 SE2d 658).

4. In his fifth enumeration of error, defendant contends the trial court "erred in admitting tapes of political and racial commentary made by the Defendant on his telephone answering machine."

The trial court allowed the State to introduce into evidence seven tape recorded messages which were prepared by defendant and transmitted to interested persons through defendant's telephone answering machine. While these tape recordings were saturated with defendant's political and racial commentary, defendant objected only to certain specified language in each of four tape recorded messages dated February 18, 1986, March 4, 1986, March 10, 1986, and March 22, 1986.

Defendant argues that the objected-to language has no relevance and that it was introduced for the purpose of influencing the jury. We do not agree. The objected-to language, considered in context, demonstrates racial overtones and shows defendant's bent of mind and is relevant to the issue of defendant's intent to terrorize. See *Wood v. State*, 255 Ga. 697, 698 (4) (341 SE2d 442). The trial court did not err in admitting the entire tape recorded messages into evidence. See also *Shafer v. State*, 191 Ga. 722, 727 (13 SE2d 798).

5. In his sixth enumeration of error, defendant argues that the trial court erred in allowing a Georgia Bureau of Investigation agent to testify that he had seen defendant at other Ku Klux Klan demonstrations with weapons. More specifically, defendant refers to the testimony of Special Agent Scott Curley who testified that he has observed defendant at other Ku Klux Klan "functions" in "possession of both automatic pistols, revolvers, shotgun, also some type of rifle."

This evidence was relevant as it demonstrated defendant's bent of mind to terrorize by displaying dangerous weapons at public demonstrations. See *Wood v. State*, 255 Ga. 697, 698 (4), supra; and *Sport v. State*, 253 Ga. 689 (1) (324 SE2d 184).

6. Defendant contends in his seventh enumeration of error that the trial court erred in allowing the State's attorney to cross-examine defendant regarding the "hometowns" of his companion demonstrators. Defendant argues that this evidence "inflamed" the jury because "outsiders had come into their community and created an embarrassing incident."

The State's attorney had the right to make a thorough and sifting cross-examination of defendant. OCGA § 24-9-64. "[G]reat latitude should be allowed by the court where the purpose of the interrogation is to impeach or discredit the witness by showing his bias and interest in the case. [Cits.] . . . The discretion of the court in controlling the conduct of counsel towards an opposing witness will not be interfered with unless some gross outrage to the party, and resulting damage to his cause, clearly appear. [Cit.]" *Griffin v. State*, 18 Ga. App. 462 (2)

(3) (89 SE 537).

In the case sub judice, the State contends the Ku Klux Klan demonstration in the victim's "neighborhood" was not to protest drug related problems in the area, as alleged by defendant, but was to terrorize the occupants of that community "and antagonize them into a potentially hazardous . . . confrontation." In this vein, the State argues that its cross-examination of defendant as to the "hometowns" of defendant's companions was relevant to prove the "subjective intention" of defendant in conducting the demonstration.

Although we find the State's reasoning far reaching, we find no prejudice to defendant which demands a new trial. See William W. Daniel, Ga. Criminal Trial Practice (1986 ed.), § 20-22. This enumeration of error is without merit.

7. In his eighth enumeration of error, defendant contends the trial court erred "in admitting evidence about the arrest and conduct of one Billy Roland several hours prior to the alleged incident forming the basis of [his] prosecution." We do not agree. Defense counsel opened the door to this line of questioning by stipulating into evidence that Billy Roland was arrested on the day of the demonstration. See *Brown v. State*, 175 Ga. App. 246, 247 (3) (333 SE2d 124).

8. Defendant in his ninth enumeration of error contends the trial court "erred in admitting evidence of the effect of the demonstration on law enforcement and the cost of the demonstration to the police authorities." Defendant argues that this evidence was irrelevant and "was calculated to inflame and prejudice the jury by conveying to the jurors the idea that the Defendant was interfering with police efforts to control illegal drug traffic . . ."

While this evidence is irrelevant to the charge against defendant, we find no error since defense counsel opened the door to this line of inquiry upon his cross-examination of a local law enforcement officer. See *Brown v. State*, 175 Ga. App. 246, 247 (3), supra.

9. In his last enumeration of error, defendant contends that the evidence was insufficient to support the verdict. We do not agree.

Two witnesses testified and corroborated the victim's testimony that defendant threatened him on the day in question. This evidence was more than sufficient to sustain defendant's conviction for the offense of a terroristic threat under the standard of proof set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560). See OCGA § 16-11-37 (a).

*Judgment affirmed. Birdsong, C. J., Banke, P. J., and Benham, J., concur. Deen, P. J., concurs specially. Carley, Sognier, Pope and Beasley, JJ., dissent.*

DEEN, Presiding Judge, concurring specially.

This case may demonstrate that if one plays with fire he is likely

either to get burned or to be caught in a cross fire, or, as noted by the first chief judge of this court, Benjamin Harvey Hill, "[t]o shoot craps is to play craps." *Sims v. State*, 1 Ga. App. 776, 777 (57 SE 1029) (1907). Cursory examination of the majority opinion, the dissenting opinion, and the record convinces me that the appellant may not have received a perfect trial but was fairly convicted, thus permitting me to concur in the judgment of the majority opinion only.

BEASLEY, Judge, dissenting.

I respectfully dissent, as a new trial is required because of the trial court's limitation on the subpoena duces tecum for the newspaper's photographs and because of the irrelevant and inflammatory evidence admitted. The first issue is addressed in Division 1 and the second in Divisions 4, 5, 7 and 8 of the majority opinion. In so dissenting, I do not mean to concur in the ruling on the photographs subpoenaed from law enforcement authorities but simply acquiesce in it at this juncture. I do concur in Divisions 2 and 3. As to Division 9, since the presentation of evidence was reversibly flawed, the issue is moot.

Defendant was charged with making a terroristic threat to Jalasker Lyles with the purpose of terrorizing him, by threatening to commit a crime of violence upon him, that is, by threatening to shoot him. OCGA § 16-11-37 (a) defines the crime of terroristic threat as occurring "when [a person] threatens to commit any crime of violence . . . with the purpose of terrorizing another . . . or in reckless disregard of the risk of causing such terror. . . ." The latter alternate is not involved here. The statute also provides that a conviction cannot be had on the uncorroborated testimony of the victim.

Thus three elements must be proved: that the statement (if it was a statement, as here) was made; that it was a terroristic threat; and that the maker intended to terrorize the subject of the threat. See *Wilson v. State*, 151 Ga. App. 501, 503 (6) (260 SE2d 527) (1979); *Boone v. State*, 155 Ga. App. 937, 939 (2) (274 SE2d 49) (1980).

1. A representative for the newspaper stated that there were "215 or so negatives and slides" of the occasion. The defendant advised the court that all of them were needed because at least some of them would be relevant to test the truth of the testimony of the alleged corroborating witnesses, who obviously were present, to possibly impeach the police officer and witnesses as to what happened and who was where when, and to confirm defendant's version of the situation so as to support his defense that the statement, if made, was uttered in self-defense and for his own protection because of fear in the circumstances.

There would be no way to test the precise relevancy of the photographs in advance because defendant did not know how the state's

witnesses would describe the incident or how far beyond its immediacy into the whole demonstration event the court would allow the evidence to extend. Yet the photographs, by their very nature as described by the newspaper's representative, "could well have been critical" to the purposes of impeachment and the corroboration of the defense. The quoted words state the test that was applied in *Cofield v. State*, 247 Ga. 98, 106 (3) (274 SE2d 530) (1981), another case involving the compulsory process issue. What is dispositive in the first place, however, is that the newspaper had no privilege which would guard these photographs from production for the purposes advanced here. *Hurst v. State*, 160 Ga. App. 830 (1) (287 SE2d 677) (1982). Defendant was denied access to arguably material evidence.

The problem is not solved by the in camera inspection. To begin with, the court could not in advance divine what would or would not be impeaching evidence.

In the second place, the court refused to look at all of the photographs sought. The lines of demarcation which the court drew, with respect to what had to be produced for its viewing and what could be withheld, left outside of its determination photographs which prima facie would have been relevant to one of these material purposes stated. The reconstruction of events, which was in fact assertedly shown by the State through testimony at the trial which followed, is often measurably aided by photographs, especially when taken simultaneously with the event. Memories fade and are warped by perspective.

As defendant has shown, the refusal here was especially harmful because so much emphasis was put by the State on what occurred outside of the presence of the defendant and the allegedly threatened person at the time of the confrontation and also much in advance of that incident.

Thirdly, what is the authority for an in camera inspection of these non-privileged negatives and slides? Neither *Byrd v. State*, 171 Ga. App. 344, 345 (3) (319 SE2d 460) (1984), nor *Jinks v. State*, 155 Ga. App. 925 (2) (274 SE2d 46) (1980), provide it. *Byrd* addresses the in camera procedure provided by law for protection of prosecution files when a *Brady*[1] request is made for exculpatory materials. *Jinks* affirms denial of access to the arresting officer's personnel file because defendant could show no relevancy to the issues on trial. It did not even mention an in camera inspection.

Moreover, how can "we find any photographs not depicting defendant or the victim irrelevant to defendant's defenses to the offense of a terroristic threat or for the purpose of impeaching the State's

---

[1] *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

witnesses," without an examination of the photographs which are admittedly a) in existence, b) in the custody of the newspaper, and c) depictions of the very event about which there was much testimony at trial? We cannot make such a judgment without viewing the depictions and comparing them with the evidence produced at trial.

Thus, as appellant urges, his Sixth Amendment right to compulsory process to secure relevant evidence, recognized in *Washington v. Texas,* 388 U. S. 14 (87 SC 1920, 18 LE2d 1019) (1967), was violated because arguably relevant and material evidence was foreclosed. See *Cofield v. State,* supra; *Hurst v. State,* supra.

2. The evidence discussed by the Court in the remaining divisions listed went far afield of proving the intent to terrorize Mr. Lyles when the statement was made as the two men confronted one another during the demonstration.

Tapes made of recorded telephone messages days and even weeks before the incident on trial, which messages were not even directed to the victim, only remotely suggested defendant's intent when he made the statement "[g]et back or I'll shoot, I'll shoot." If the racist telephone messages tended to prove that defendant intended to terrorize Mr. Lyles when the statement was made, their inflammatory nature outweighed their probative value because of the prejudicial effect they would have on the jury. That is the test, as applied in *Wood v. State,* 255 Ga. 697, 698 (4) (341 SE2d 442) (1986). Defendant's intent at the time, which was amply ascertainable by evidence of the circumstances of the demonstration and the environment in which the statement was made, was the issue. Nor were these or any other evidence discussed herein evidence of "similar transactions" so as to be probative of defendant's bent of mind or intent and admissible under that principle, which is set out, e.g., in *Bacon v. State,* 209 Ga. 261 (14) (71 SE2d 615) (1952); *Felts v. State,* 154 Ga. App. 571 (2) (269 SE2d 73) (1980).

The evidence that defendant had been seen at *other* demonstrations with weapons was totally without relevance to the issues involved in this case. Defendant was not charged here with a weapons offense. In addition, the undisputed evidence was that he did not have a weapon at the time he allegedly made the threat. Thus the evidence did not involve similar "prior criminal actions," which is what *Sport v. State,* 253 Ga. 689 (1) (324 SE2d 184) (1985) stands for. Moreover, defendant and Mr. Lyles were strangers, so he could not be making the threat with the idea that he knew Mr. Lyles would fear that he had a weapon based on any previous knowledge Lyles had of defendant's prior weapon-carrying. Thus the purpose on which the Court pins relevancy is non-existent here, and none other appears.

Evidence about the arrest and conduct of Billy Roland at a time much previous and at another location that day was not shown to

have any relevancy whatsoever, except to inflame and draw attention away from the sole issues in the case. By agreeing to stipulate to the simple fact that Roland had been arrested, defendant did not agree to a full exploration of this event, which did not directly involve defendant and concerning which he was not on trial. The stipulation was made precisely for the purpose of averting such an excursion. Defendant here did not step into that territory, as did counsel in *Brown v. State*, 175 Ga. App. 246, 247 (3) (333 SE2d 124) (1985).

Nor did defendant open the door to evidence of the effect of the demonstration on law enforcement and the costs of it to the public, members of which sat on the jury deciding this leading demonstrator's fate. This evidence is irrelevant, according to the majority, and with that I agree. Defendant had inquired of the officer on another subject entirely, that is, whether the area of the incident was a known area of drug traffic and police efforts there in that regard. This line of cross-examination did not lie in the same territory as that described above which the State elicited on redirect examination over objection.

Due to the vast amount of irrelevant and prejudicial evidence which the jury was permitted to consider, it is difficult to conclude that defendant's trial was confined to whether or not he committed the offense of making a terroristic threat to Jalasker Lyles. For the reasons stated, the law requires a new trial.

DECIDED DECEMBER 18, 1987 —
REHEARING DENIED DECEMBER 18, 1987 — 

*Sam G. Dickson*, for appellant.

*C. Andrew Fuller*, District Attorney, *Daniel A. Summer, Donald F. Chase II*, Assistant District Attorneys, for appellee.

*James C. Rawls, V. Robert Denham, Jr., Jennifer F. Weiss*, amici curiae.