45339. CARVER v. THE STATE.
(369 SE2d 471)

CLARKE, Presiding Justice.

Carver and several other members of the Ku Klux Klan, all wearing white robes and conical hats, conducted a demonstration in a

black neighborhood in Gainesville, Ga. During a verbal confrontation between the demonstrators and neighborhood residents, Carver reached into his robe and said to a resident, "Get back, I'll shoot." Carver was convicted of making a terroristic threat. The Court of Appeals affirmed the conviction, *Carver v. State*, 185 Ga. App. 436 (364 SE2d 877) (1987), and we granted Carver's petition for certiorari. A more detailed account of the facts appears in the Court of Appeals opinion.

Carver objects to the admission of certain evidence he deems prejudicial. The trial court admitted evidence of Carver's possession of guns at previous Klan rallies, Carver's racist telephone messages recorded to answer inquiries about this demonstration, evidence of an earlier arrest of one of the other demonstrators, and the cost to the public of policing the demonstration and its effect on law enforcement. He also complains that the trial court erred in quashing his subpoenaes for the production of documents in the possession of Southland Publishing Company d/b/a *The Times*.

1. A person commits the offense of a terroristic threat when he threatens to commit any crime of violence. OCGA § 16-11-37. The crime of terroristic threats is complete when the threat is communicated to the victim and is coupled with the intent to terrorize. *Boone v. State*, 155 Ga. App. 937 (274 SE2d 49) (1980). Since a deliberate intent to terrorize is an integral part of the crime, evidence showing terroristic intent is not only relevant, but necessary, to proving such a case. The disputed evidence was properly admitted to show Carver's terroristic intent.

2. We find no error in the Court of Appeals holding that Carver failed to show he was denied material exculpatory information from the files of *The Times*.

3. On direct examination the police chief was asked by the State if police officers were on duty at the scene of the demonstration. The witness responded affirmatively and then volunteered that the cost of this was about $13,000 to the county. At this point, defense counsel objected stating as his grounds that the testimony had no probative value. The district attorney then stated, "We don't insist on it." In response to all this, the court instructed the jury to disregard any testimony as to the cost of officers being present. The record does not indicate a motion for mistrial or a request for any further curative instructions.

The Court of Appeals held the testimony of the police chief to be irrelevant but found that the defense had opened the door to the testimony by its cross-examination of a local law enforcement officer. We find no harmful error, particularly in view of the court's instructions and the failure of the defense to pursue the matter further.

*Judgment affirmed. All the Justices concur, except Marshall, C.*

*J., Smith and Bell, JJ., who dissent.*

SMITH, Justice, dissenting.

We granted certiorari in *Carver v. State*, 185 Ga. App. 436 (364 SE2d 877) (1987), to review several questions we raised when we granted the writ. The questions follow the facts.

Appellant Daniel Carver, a member of the "Ku Klux Klan," along with his wife, child, and approximately ten other "klansmen" and "klansladies" walked into a black neighborhood for the ostensible purpose of demonstrating their disapproval of drug sales emanating from the area. Most of the appellant's followers were dressed in white robes and conical hats. Approximately two to three hundred black citizens gathered around the appellant and his followers as they stood for several hours in front of a housing project. Some of the black citizens stood and watched while others pelted the appellant and his followers with threats and at times chanted "kill them." In addition to the verbal assault, bottles were thrown and there was some pushing. The appellant advised his followers to remain calm and the record indicates that his instructions were followed. One of the State's witnesses testified that he did not see any "Klan" member strike or threaten any black person during the time he was present.

The police requested the appellant to move his people to the other side of the street to separate them from the black citizens. The appellant obliged and crossed the street so that the two groups were separated.

Jalasker Lyles arrived on the scene after the appellant had distanced himself from the black citizens. Mr. Lyles first advised a group of young blacks not to throw the bricks and bottles they had been collecting. Thereafter, Mr. Lyles crossed the street and told the appellant that he should leave "our side of town." Mr. Lyles and the appellant exchanged words and Mr. Lyles walked away. This was the first time the appellant and Mr. Lyles had ever seen or spoken to one another.

Later, Mr. Lyles, Herman Collins, and Rufus Randolph, followed by a crowd of approximately sixty to seventy blacks, some of whom were chanting, "get em," surged across the street. The police tried to hold back the angry, moving crowd, but according to Mr. Collins, the police were unable to do so because there was not enough "manpower to keep everybody off that side of the street." The appellant testified that he was afraid when the angry throng approached.

Mr. Lyles testified that as the police were attempting to hold back the advance, he said to the appellant, "Why don't you go ahead and leave because the people done got angry and I'm scared they are going to start a riot." He testified further that the appellant said, "Get back or I'll shoot, I'll shoot." The police responded when they

heard Mr. Lyles yelling that the appellant had a gun.

An officer asked Mr. Lyles if he wanted to swear out a warrant. The officer explained that Mr. Lyles would have to take out the warrant because none of the police or GBI agents heard a threat. The officer took Mr. Lyles to the courthouse where a warrant was issued.

1. Whether the Court of Appeals erred in affirming the trial court's decision to quash the appellant's subpoena for the production of photographs made by Southland Publishing Company, d/b/a *The Times*.

When the trial court originally ordered *The Times*, the local newspaper, to produce the 215 photographs it had taken the day of the incident, it eloquently expressed the need for the photographs and the minimal burden on the press as follows:

> Both the courts and the press serve the public by engaging in truth-finding enterprises. In basic character and nature they are in harmony with each other, not in conflict. When conflicts do occur between the press and the needs of the criminal justice system, those conflicts are resolved through recourse to a judicial balancing process that gives full consideration to the legitimate, yet conflicting, interests of both. In this case, the photographic materials are highly relevant and material to defendant's claim of self defense. The photographs are unique records of a past event unavailable from any other source. The burden placed on *The Times* by a subpoena limited to materials of this specific nature is minimal, as is the degree of intrusion into the newspaper's affairs. Therefore, production of the photographic materials will be required.

However, during a hearing on *The Times* motion for rehearing the trial court substantially changed direction. During the same motion hearing the trial judge expressed his irritation to *The Times* attorney. The judge was annoyed because an article in *The Times* criticized him for not quashing the subpoena relating to the photographs and the article advanced arguments that had not been made in court. The judge stated,

> I would solicit the help of *The Times* in trying to handle this in a responsible way, so that citizens can know that this court is not simply going to, in some reckless way, turn over photographs to Mr. Carver or to other people who might misuse them in some way.

The trial court thereafter limited the photographs that were required to be turned over for an *in camera* inspection to those taken before

the arrest and only those which showed either the appellant or Mr. Lyles or both. The trial court allowed *The Times* to decide which pictures fit the criteria.

During the motion hearing and before this court, *The Times* attorney argued that the other photographs were not relevant to the charges against the appellant or his defense. There can never be a judicial determination of the relevancy of the photographs. The determination was made by the attorney for *The Times*.

The attorney for *The Times* in responding to a question from this court indicated that providing all the photographs is an intrusion into the news gathering process, and

> it acts as a deterrent to thorough news gathering and can even act in a case such as this as an impediment to news gathering and news reporting because if the neighborhood perceives *The Times* as an investigative arm of the Klan for example. . .if photographs *The Times* have are turned over for investigative purposes to the Klan, people in that neighborhood may not be receptive to the news media coming into that neighborhood and reporting. . . .

Why would *The Times* feel that it would be perceived as an investigative arm of the "Klan" if they allowed the appellant to view the photographs? There is one reason that quickly comes to mind; the photographs support the appellant's version of what occurred during the day and test the credibility of the State's witnesses. This conclusion is bolstered by *The Times* attorney's statement during the pretrial motions. In response to a question, he said, "there are some photographs that *The Times* chose not to run, which the citizens who were photographed might not like furnished to the Klan."

The Constitutions of the United States and Georgia guarantee every citizen regardless of race, creed, religious belief or political persuasion, a fair and impartial trial. The press would use the same consitutional provisions to hide behind and to deny a citizen the possibility of a fair and impartial trial. The press, despite its insistence that the First Amendment protects it in this case, is part of the community not apart from the community. As such, it is burdened with certain obligations to the community. The press, more than any other private institution, must encourage equal treatment for all.

The appellant's "Sixth Amendment right to compulsory process to secure relevant evidence, recognized in *Washington v. Texas*, 388 U. S. 14 (87 SC 1920, 18 LE2d 1019) (1967), was violated because arguably relevant and material evidence was foreclosed. [Cit.]" *Carver v. State*, 185 Ga. App. at 443 (J. Beasley, dissenting).

2. Whether the Court of Appeals erred in affirming the trial

court's decision to admit certain tape-recorded messages.

The appellant used his telephone answering machine to provide information regarding "Klan" activities and to express his racial views. The Gainesville Police Department obtained the taped messages by monitoring the appellant's telephone answering machine over a period of approximately eight months. Some of the tapes were played to the jury with instructions that they were to be considered only for the purpose of showing the appellant's "state of mind or intent prior to the alleged incident." There was no evidence that Mr. Lyles had heard the tapes. The Court of Appeals relied upon *Wood v. State*, 255 Ga. 697 (341 SE2d 442) (1986) and *Shafer v. State*, 191 Ga. 722 (13 SE2d 798) (1941) in upholding the admission of the tapes.

The evidence was allowed in *Wood* and *Shafer* because it involved behavior or conduct on the part of the defendants that was almost identical to the behavior of the defendant's at the time of the crime for which they were on trial, and its probative value outweighed the danger of prejudice. In *Wood*, supra, the evidence established that the defendant while wearing a German military helmet, shot and killed a Jewish woman in his home. The prosecution was allowed to introduce photographs of the defendant dressed in German military clothing, wearing firearms, and a photograph of Nazi memorabilia in his home. The photographs were admissible to show the defendant's bent of mind, but only because the probative value of the photographs outweighed the danger of prejudice. Id. at p. 698.

The evidence presented in *Shafer*, supra, established that the police had been trying for several years to catch Shafer selling liquor in his home. During one attempt, Shafer shot and killed a policeman who had become involved in a pushing match with Shafer's wife. She was attempting to prevent him from following her into a bathroom. At trial, an officer was allowed to testify that during an earlier incident when a policeman tried to break down the bathroom door after Mrs. Shafer ran into the bathroom Shafer said, " ' "I'm going to shoot some of you smart policemen, you sons of bitches, running in here and snatching my wife and pulling her around." ' " Id. at pp. 726-727.

The behavior of the appellant in simply exercising his First Amendment right to freedom of speech by expressing his racist views to those who called his telephone number for "Klan" information was, by no stretch of the imagination, similar to his alleged behavior at the time Mr. Lyles and the chanting crowd were surging across the street toward him. The taped racist messages did not convey any specific threats and could only be heard by calling his home. The prejudice to the appellant outweighed the probative value of the tapes and they should not have been allowed. The appellant said nothing illegal. Indeed, the court is using the appellant's protected speech to strangle him in a criminal proceeding.

3. Whether the Court of Appeals erred in affirming the trial court's decision to allow a Georgia Bureau of Investigation agent to testify that the appellant had been seen at other "Klan" functions with weapons.

"Evidence must relate to the questions being tried by the jury and bear upon them either directly or indirectly. Irrelevant matter should be excluded." OCGA § 24-2-1. The questions being tried were, 1) did the appellant communicate a threat, 2) was the communicated threat a threat of violence, and 3) did the appellant make the threat with the intent to terrorize the victim. See OCGA § 16-1-37 (a).

The Court of Appeals relied on *Sport v. State*, 253 Ga. 689 (324 SE2d 184) (1985) to uphold the lower court's decision. *Sport* used the following test from *Walraven v. State*, 250 Ga. 401, 408 (297 SE2d 278) (1982), to determine when evidence of *independent crimes* may be admissible:

> [I]n certain circumstances, evidence of independent crimes is admissible. Two conditions must be satisfied. "First, there must be evidence that the defendant was in fact the perpetrator of the independent crime. Second, there must be *sufficient similarity* or *connection* between the independent crime and the offense charged, that proof of the former tends to prove the latter." [Cit.] [Emphasis supplied.]

First, the *Walraven* test is to be applied when the prosecution attempts to introduce similar "criminal" acts. There was never any evidence that the appellant was charged with a weapons violation either the day of the incident or at any other time. To my knowledge this is the first time any court in the State of Georgia has allowed the trial court to use an unrelated legal act to prove one guilty of an alleged crime. Second, assuming the *Walraven* test is applicable to this case, there is not sufficient similarity or connection between legally having weapons at other times and places and the crime charged. Mr. Lyles did not see the appellant with a weapon, and the appellant did not have a weapon. Proof that the appellant was legally in possession of weapons at other times and places does not tend to prove that the appellant made a terroristic threat. The agent's testimony was irrelevant and prejudicial to the questions before the jury and only served the purpose of inflaming the jury.

4. Whether the Court of Appeals erred in affirming the trial court's decision to allow evidence about the arrest and conduct of Billy Roland.

A police officer testified that more than two hours before the alleged terroristic threat, at a location away from where this incident took place, Billy Roland, a member of the White Patriots Party, was

arrested for using abusive language.

The crime of a terroristic threat "focuses solely on the conduct of the accused. . ." *Boone v. State*, 155 Ga. App. 937, 939 (274 SE2d 49) (1980). The trial court erred in allowing into evidence this irrelevant and prejudicial testimony. This is the first time on record that evidence of the arrest of another person, charged with a different crime, at a different time and place, where no conspiracy was alleged, was introduced in a completely separate criminal trial.

5. Whether the Court of Appeals erred in affirming the trial court's decision to admit evidence about the alleged effect of the "Klan's" presence on drug investigations in the area and the cost of police participation.

The state's theory was that the appellant, without any weapons and accompanied only by his wife, child, and a small number of supporters went to the black community to terrorize the black citizens. The appellant asserted that he went to that particular black neighborhood to protest drug sales, thus, he had to show that there was a drug problem in the area. The only way he could prove that the area was known to be a source for drugs was by asking questions about drugs in the area.

The appellant's line of questioning did not open the door for the prosecution to elicit testimony from the sheriff indicating that the "Klan's" presence resulted in the "dramatic" decline of drug sales, the flight of several large dealers, or the disruption of police investigations for two months. Nor did this line of questioning open the door for the sheriff to testify about the cost to the citizens of Hall County for police protection. I would venture to say that this is the first case on record where evidence about the effect on police investigations, after an alleged crime, has been used as proof of the alleged crime.

6. Whether the Court of Appeals erred in affirming the trial court's decision that the evidence was sufficient to convict the appellant of the crime charged.

At the time of the alleged threat the appellant was surrounded by police and GBI agents. However, the angry, chanting crowd was pushing across the street to where the appellant, his family, and followers, greatly outnumbered, had withdrawn at the request of the police. If the appellant did make the alleged threat, he was justified in expressing a threat that he knew he could not carry out when he reasonably believed that such was necessary to defend himself and his family against imminent harm. See OCGA § 16-3-21 (a).

Additionally, much of the evidence which was admitted at trial should have been ruled inadmissible. To say that this evidence informed the jury and did not inflame them against the appellant is to say that the sun will rise in the West tomorrow. The fact that the alleged threat was heard by only three people in the crowd (and more

importantly that the police who were standing nearby did not hear it) tends to indicate that this decision was the by-product of an inflamed jury.

People whose political views are unpopular are supposed to be protected by the same Constitution as those whose views are popular.

DECIDED JUNE 23, 1988 —
RECONSIDERATION DENIED JULY 13, 1988.

*Sam G. Dickson,* for appellant.

*C. Andrew Fuller, District Attorney, Daniel A. Summer, Assistant District Attorney,* for appellee.

*James C. Rawls, V. Robert Denham, Jr., Jennifer Falk Weiss,* amici curiae.