### 60476. BOONE et al. v. THE STATE.

Birdsong, Judge.

The Boone brothers, Aubry and Barry, were convicted of two counts of terroristic threats and sentenced to serve five years on each count. They appeal, and we affirm. *Held:*

1. Appellants assert that the trial court erred in denying their motion for directed verdict of acquittal because the corroboration requirements of the terroristic threats statute (Code Ann. § 26-1307 (a)) were not met. The two victims were GBI agents conducting an undercover narcotics investigation in Washington County. One agent testified that in the course of this investigation they went to the house where they believed Barry Boone to reside and were invited inside by a young woman. While they were sitting in the living room waiting for Boone, the door crashed open violently and Barry and Aubry Boone "came storming" in brandishing a rifle and a shotgun. "They screamed that everyone was to keep their seats and as Barry Boone went . . . running through the room, waving the thirty thirty rifle around, telling everybody to keep their seats, nobody was to move, he ran towards the rear portion of the room to a door at the rear and as he turned around, he asked, 'where are the rest of the pigs?'. . . At that time, he, not finding anyone back there, he then proceeded to ask us what we were doing there. . . At this time, he said, 'I know who you are. I know what you're doing here,' and . . . Aubry Boone spoke up and said that he knew who we were and that we had come to get his little brother. At that time . . . he made some comments as to drugs, saying if we were interested in any drugs, we could come to him. We

weren't to come to his little brother... Then Barry Boone instructed us to leave the residence. As we were starting to make a move to leave ... Aubry Boone told us we better freeze and get up against the wall.... At this time, he told us to get up, put our hands up on the walls. I proceeded — both of us rose at that time. Aubry Boone had come further into the room and was pointing the twelve gauge shotgun at us at that time. I got up and put my hands up against the wall as my partner did and he proceeded to tell us that if we were the law, he was going to blow us away. So he started to search my partner. My partner turned a little bit and — to look back at him, started to move some and Aubry Boone raised the shotgun, raised the butt of the shotgun, saying 'you better not move. I'm going to bash your head in. What are you trying to do. Don't you move, I'll bash your head in.' At this time, also as my partner moved, Barry Boone fired a shot from the thirty-thirty rifle... The round appeared to go up through the roof, through the ceiling of the room we were in. We then froze, certainly, at this time and Barry Boone also said that if we moved, he was going to blow us away. He also commented again at this time, stating that he had been told by the law and by the people on the street what we were doing in town and that he knew that we were narcs and he was going to blow us away... He then reached down and jerked ... my partner's wallet out of his pocket ... as he kneeled down next to the table. There was a little coffee type table there in front of the couch that he was leaning over. He then went through the wallet, pointing the shotgun at this time, up towards me and telling us we better not move. He went through the wallet and then after he had gone through that wallet, he handed it back to my partner and then demanded my wallet. At that time, I removed my wallet from my pocket and handed it, also, to Aubry Boone. He went through my wallet in the same manner as he had done to my partner... He then, after this, he told us that we had better, according to him, get the hell out of there. At that time, we did exit the residence. They followed us to the front door and at that time, Barry Boone made a statement as to the powerful rifle that he was carrying. Said that he was carrying a thirty thirty rifle and that it would shoot quite a distance. That we better not turn around or try to come back because he would blow us away. At that time, we left the residence. Q Did you ever identify yourself as a police officer during the course of this? A No, sir, I did not. Q Why did you not do that? A Because I had been told by both Barry Boone and Aubry Boone, if I was a police officer, they were going to kill me."

This testimony was corroborated by the other agent. We do not agree that the statutory requirement of corroboration "of the testimony of the party to whom the threat is communicated" demands corroboration by some evidence other than another party to

whom it was communicated and thus precludes corroboration by a co-victim, as urged by appellants. Code Ann. § 26-1307 (a) does not specify how the testimony must be corroborated. "As in rape cases, the quantum of corroboration need not in itself be sufficient to convict, but need only be that amount of independent evidence which tends to prove that the incident occurred as alleged. See *Burnett v. State,* 236 Ga. 597 (225 SE2d 28). Slight circumstances may be sufficient for corroboration and the question of corroboration is one solely for the jury. If there is any evidence of corroboration, this court will not go behind the jury verdict and pass on its probative value. *Morgan v. State,* 229 Ga. 532 (192 SE2d 338). As there was evidence of corroboration, this enumeration is without merit." *Moss v. State,* 148 Ga. App. 459, 460 (1) (251 SE2d 374). See also *Neal v. State,* 152 Ga. App. 270 (1) (262 SE2d 564).

2. Our review of the victims' testimony likewise convinces us that the statements and actions of the appellants constituted terroristic threats as contemplated by the statute, and were not "conditional threats" made merely to preserve the status quo while the appellants determined who the strangers were in Barry Boone's house. Direct evidence that the threats were made for the purpose of terrorizing another is not necessary if the circumstances surrounding the threats are sufficient for a jury to find the threats were made for such a purpose. *Moss v. State,* 139 Ga. App. 136 (228 SE2d 30). Appellants' argument that this issue is important because it goes directly to the question of the degree of fear into which the victims were placed is without merit because the crime of terroristic threats focuses solely on the conduct of the accused and is completed when the threat is communicated to the victim with the intent to terrorize. *Wilson v. State,* 151 Ga. App. 501, 503 (6) (260 SE2d 527). The evidence here was ample to support a finding by the jury that the threats of the appellants were made with the requisite criminal intent.

3. Nor did the charge of the court improperly shift the burden of proof to appellants so as to provide cause for reversal. Taken as a whole with the qualifying instructions which were given that the presumption of criminal intent was rebuttable, a "permissive" rather than "mandatory" presumption was presented. Such presumptions are not inherently unconstitutional. *Skrine v. State,* 244 Ga. 520 (260 SE2d 900); *Whisenhunt v. State,* 152 Ga. App. 829 (264 SE2d 271).

*Judgment affirmed. Deen, C. J., and Sognier, J., concur.*

SUBMITTED SEPTEMBER 8, 1980 — DECIDED OCTOBER 2, 1980 —

*Al Horn, Barry Hazen, Bruce Maloy,* for appellants.
*H. Reginald Thompson, District Attorney,* for appellee.