**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. (Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008) http://www.gaappeals.us/rules/

**October 18, 2012**

# In the Court of Appeals of Georgia

A12A0840. ORR v. THE STATE.

Phipps, Presiding Judge.

Donald Todd Orr was convicted in May 2011 of two counts of reckless conduct and given two 12-month sentences to be served on probation, consecutively. Several months later, the state filed a petition to revoke Orr's probation, alleging that Orr had violated two conditions of probation in that he had: (i) committed a new criminal offense, terroristic threat; and (ii) failed to timely pay fines, resulting in $38.00 in arrears. After a hearing on the petition, the trial court entered an order finding that Orr had violated both conditions, revoking the balance of his probation, imposing upon Orr confinement, and providing further: "remit the case allowing probation to FIFA the balance." In this appeal, Orr challenges the sufficiency of the evidence and

contests various other aspects of the revocation order. For reasons that follow, we vacate the revocation order and remand the case with direction.

1. Orr contends that the trial court erred by revoking his probation based (in part) upon its finding that he committed the offense of terroristic threat; Orr challenges specifically the sufficiency of the evidence. This contention is without merit.

"A court may not revoke any part of any probated or suspended sentence . . . unless the evidence produced at the revocation hearing establishes by a preponderance of the evidence the violation or violations alleged."[1] "This court will not interfere with a revocation unless there has been a manifest abuse of discretion on the part of the trial court."[2]

"Pursuant to OCGA § 16-11-37 [(a)], a person makes a terroristic threat 'when he or she threatens to commit any crime of violence . . . with the purpose of terrorizing another. . . .'"[3] The state sought to show that Orr had committed the

---

[1] OCGA § 42-8-34.1 (b).

[2] *Scott v. State*, 305 Ga. App. 596 (699 SE2d 894) (2010) (citation, punctuation, and footnote omitted).

[3] *Layne v. State*, 313 Ga. App. 608, 610-611 (1) (722 SE2d 351) (2012) (quoting OCGA § 16-11-37 (a)) (footnote omitted).

2

offense of terroristic threat against his wife during a telephone call between them. Since about January 2011, Orr was no longer living in the residence he had shared with his wife of 24 years. And by July 2011, Orr's wife had learned of Orr's new girlfriend. Orr's wife terminated service on Orr's cellphone, deactivated his bank card, and locked him out of a Facebook account. Upset about these actions, Orr made several telephone calls to his wife during the last week of July. The telephone call giving rise to the instant case occurred at about 11:15 p.m. on July 30, 2011. The state presented the testimony of Orr's wife and family members who gave the following accounts.

Orr's wife testified that she was at home when Orr called her. Also at the residence were their two adult and one teenaged daughters, one daughter's husband, Orr's brother, and that brother's wife. They were all seated around the kitchen table. During the telephone call, Orr's wife testified, Orr was "ranting and raving," upset because of the Facebook account. She hung up, and he immediately called her back, again "ranting and raving" about Facebook. She told him that she should have divorced him a long time ago and that, if she had, their daughter would still have her arm. (Orr's wife explained at the revocation hearing that, during the prior Christmas holiday, Orr discharged a firearm and accidently shot their daughter's arm, resulting

in its amputation.) Orr's wife testified: "And then in the conversation he says, 'Instead of – at Christmas I should have not killed myself. I should have blown your fucking head off.' And then he makes a comment, 'I can come home.'" Orr's wife continued: "[A]fter he said he would blow my fucking head off, he said, 'I can come home tonight. You know that? Do you know that?' And I said, 'Yes, Todd, I know that.'" Throughout that telephone call, Orr had been screaming. According to Orr's wife, "when he said, 'Do I need to come home,' that meant that he could have came home.'" Orr's wife hung up again. Petrified, and believing that she and her family were at risk, she summoned police. After the responding officer left the house, the family left, too. The next day, Orr's wife moved out of the residence.

Several of the family members who were seated around the table had overheard Orr, clearly. Orr's brother gave the following account. Orr was complaining and fussing about being locked out of his Facebook account. Orr's wife confronted Orr about his girlfriend, then hung up. Orr called right back, and their argument resumed. Orr's brother recounted that eventually, "[Orr] said something about getting a divorce. And she said, 'Yeah. I should have divorced you a long time ago and [their daughter] would still have her arm.'" Orr's brother testified that Orr then accused his wife of constantly hitting him below the belt regarding that incident, then Orr said,

4

"You know at Christmas I should have blowed your head off – your F-ing off instead of trying to shoot myself." Orr told his wife, "I'm coming home [tomorrow] night to my house." But then Orr added, "Do I need to come home tonight? . . . Do you believe me?" And Orr's wife replied, "Yes, Todd." Orr's wife hung up, looked at Orr's brother, and asked him, "What do I do now?" Orr's brother testified that he looked around the room: one of the daughters was "squalling, scared to death," and the other two also were noticeably upset. Orr's brother advised Orr's wife to do whatever was necessary to protect her family. She summoned the police, and after an officer responded to the scene and took reports, Orr's wife and family members followed Orr's brother and his wife back to their (the latter couple's) residence for the night.

Orr's adult daughter who had lost her arm also testified about the night of July 30. She described her father yelling throughout the phone exchanges and said that she could hear his words plainly. Her mother hung up after the Facebook rant, and Orr called again. The daughter recalled that Orr brought up the subject of divorce, and her mother responded that, had she divorced him a long time ago, she would still have her arm. Orr retorted that his wife had hit him below the belt and that, during last Christmas, instead of trying to kill himself, he should have blown her fucking head

off. The daughter recalled that Orr next said, "Do you believe me? Do you not believe me? I can come home tonight." She recalled also that her father had said to her mother that that was his house. Orr's daughter testified, "I was upset at the fact that he said he was going to blow my mother's head off. He made it sound very real because he said he was coming home tonight." When her mother hung up, the police were summoned.

The state called the sergeant of the sheriff's office who had interviewed Orr on August 2 at the sheriff's office. The sergeant testified that Orr admitted having had a conversation with his wife about being locked out of his Facebook account, and he admitted that he had told his wife that he was coming back to the residence because it was his home, too. But Orr denied, at least initially, making any comments about wanting to harm her. However, toward the end of the interview, Orr stated that, if he had made any such statement to his wife, he did not remember doing so.

Orr did not testify, but called several witnesses, including the law enforcement officer who was dispatched to Orr's wife's residence, Orr's girlfriend, and Orr's girlfriend's daughter. The responding officer testified about the statements made at the scene by Orr's wife and family members.

6

Orr's girlfriend testified that she was in Orr's presence at the time he placed the telephone call at issue. She recounted that, after asking about his Facebook account, Orr said that he had decided to move back into the home, and that if his family did not want to live there with him, they could move out. She described that, during the telephone call, Orr did not raise his voice and did not threaten to shoot anyone.

Orr's girlfriend's daughter testified that she, too, was in Orr's presence that evening. She overheard Orr ask someone on the telephone why he had been locked out of his Facebook account. She overheard him tell that person that he could move back if he wanted to. She testified that Orr never yelled and never said anything about blowing anyone's head off or shooting anyone.

On appeal, Orr claims that the state's case contained weaknesses and he cites evidentiary conflicts. In particular, Orr points out that the state adduced no recording of the telephone exchange. Orr also cites that the responding officer testified that family members reported at the scene that Orr's wife had set her telephone to the "speaker phone" option, but at trial, Orr's wife testified that she did *not* have that option set. Additionally, Orr argues that the state failed to show that he threatened to commit any crime of violence and failed to show that he intended to terrorize his wife. He asserts that the words he uttered revealed merely his wish that it had been

7

his wife, instead of their daughter, who *was* shot; that there was no intended connection between that uttered wish and his statements about coming to his wife's residence; and that the entire telephone episodes amounted only to typical mean-spirited banter between spouses contemplating divorce.

Concerning Orr's claims of evidentiary weaknesses and conflicts, it is well settled that "any conflicts constitute issues of credibility that must be resolved by the trial court, not this court. It was the duty of the factfinder, here the superior court, to weigh the evidence, determine the credibility of witnesses, and decide whether to accept or reject evidence introduced."[4] While some contradictory evidence was presented regarding Orr's statements and voice volume, the trial court was authorized to reject the testimony of Orr's witnesses, in favor of the testimony given by the state's witnesses.[5] The accounts of Orr's wife and family members – including Orr's daughter's testimony that "[Orr] said he was going to blow my mother's head off. He made it sound very real because he said he was coming home tonight" – authorized

---

[4] *Gaddis v. State*, 310 Ga. App. 189, 190 (1) (712 SE2d 599) (2011) (citations and punctuation omitted).

[5] See *Cannon v. State*, 260 Ga. App. 15, 16 (579 SE2d 60) (2003) (trial court, as factfinder at probation revocation hearing, was authorized to reject testimony of defendant's witnesses, in favor of state's evidence).

the trial court to find that Orr communicated to his wife a threat to commit a crime of violence against her.[6]

Moreover, despite Orr's characterization of his utterances as mere banter and Orr's assertion that his statement about shooting his wife was not related to his statements about coming to her residence that evening, the issue of whether Orr intended to terrorize his wife was a question of fact for the factfinder.[7] As this court has held:

> [T]he determination of whether a defendant has made a terroristic threat focuses solely on the conduct of the accused and [the crime] is completed when the threat is communicated to the victim with the intent

---

[6] See *Clement v. State*, 309 Ga. App. 376, 379 (1) (a) (710 SE2d 590) (2011) (noting that, under its plain and ordinary meaning, the word "threat" refers to a communication, declaration, or expression of an intention to inflict harm or damage; explaining that the specific form of a terroristic threat is not important and need not take any particular form or be expressed in any particular words, and may be made by innuendo or suggestion; determining that a communication is sufficient to constitute a threat if a reasonable person could conclude that it was a threat under the circumstances).

[7] See OCGA § 16-2-6 ("A person will not be presumed to act with criminal intention but the trier of facts may find such intention upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted."); see also *Layne*, supra at 611 (1) (issue of intent to commit terroristic threat is a question of fact for jury); *Brown v. State*, 298 Ga. App. 545, 548 (680 SE2d 579) (2009) ("The intent with which one does an act . . . is particularly an issue for the finder of fact.").

to terrorize. In this regard, direct evidence that the threats were made for the purpose of terrorizing another is not necessary if the circumstances surrounding the threats are sufficient for a trier of fact to find the threats were made for such a purpose.[8]

Here, the evidence showed that Orr called his estranged wife because he was upset by her recent actions. After she hung up on him, he immediately called her again and continued screaming, yelling, ranting, and raving so loudly that others near her could clearly discern his choice of words and tone. Having heard such, Orr's wife and family members took seriously Orr's collective statements and demeanor as a threat – summoning law enforcement and vacating the premises.[9] Indeed, Orr's heated exchange with his wife devolved to his making statements that, when taken together and in light of all the surrounding circumstances, authorized the trial court's finding, by a preponderance of the evidence, that Orr communicated to his wife a threat of

---

[8] *Layne*, supra (punctuation and footnotes omitted).

[9] See *Shepherd v. State*, 230 Ga. App. 426, 427 (496 SE2d 530) (1998) (holding that in determining defendant's intent, jury could consider testimony that threats were taken seriously); *Bostic v. State*, 183 Ga. App. 430, 433 (3) (359 SE2d 201) (1987) (noting that record disclosed that the threatened persons took the threats seriously).

committing against her a violent crime and that he did so for the purpose of terrorizing her.[10]

The trial court thus did not err by concluding that Orr violated a condition of probation by committing a new criminal offense, terroristic threat. The cases relied upon by Orr do not require a outcome in his favor.[11] Accordingly, this contention provides no basis to disturb the probation revocation order.

---

[10] See *Layne*, supra; *Clement*, supra; *Bostic*, supra (holding that question of defendant's criminal intent was an issue for the factfinder's consideration, and that the defendant was not entitled to a directed verdict of acquittal based on his argument that his threats were just "big talk"); *Boone v. State*, 155 Ga. App. 937, 939 (2) (274 SE2d 49) (1980) (holding that circumstances surrounding statements and actions of defendants supported jury's finding that terroristic threats were made with the requisite intent and were not conditional).

[11] See *Sidner v. State*, 304 Ga. App. 373, 375-76 (1) (696 SE2d 398) (2010) (reversing defendant's conviction of committing terroristic threats because there was no evidence that defendant's threats were directed toward any particular person or that defendant intended or expected that his threats would be conveyed to any particular person; the clear and oft-repeated purpose of defendant's threats was not to terrorize his neighbors, but rather to obtain a police response to disturbances on his block); *Stephens v. State*, 271 Ga. App. 509 (610 SE2d 143) (2005) (reversing conviction for terroristic threats where no evidence supported an inference that the defendant intended or expected that his written statement that he wanted to kill his supervisor, sent to the office's personnel department to explain his desire for a transfer, would be communicated to the supervisor, and when his only purpose in making the statement was to obtain a change of employment status); *Wiggins v. State*, 171 Ga. App. 358, 359 (1) (319 SE2d 528) (1984) (reversing conviction where defendant made a threat to a third party unrelated to the alleged target, defendant had a history of mental illness, and the message was conditional in nature).

2. Orr contests the sufficiency of the evidence supporting the trial court's finding that he violated the condition of probation that required him to pay a fine.

The record contains no such evidence. At the outset of the probation revocation hearing, the state's attorney and the probation officer reported to the court that no amount was outstanding. And in its brief on appeal, "[t]he state agrees that the defendant had paid the $38.00 in fines."

What is more, as Orr points out, the revocation order provided: "remit the case allowing probation to FIFA the balance." Yet the record does not reflect that, on or before the date of the revocation order, the trial court was presented evidence of any "balance" that was due. Nor does the state claim that the trial court was so presented any such evidence.[12]

Given these circumstances, we vacate the order of revocation as based, in part, on a finding not supported by the evidence; we remand the case to the trial court for entry of judgment authorized by the evidence.[13]

_____

[12] See Court of Appeals Rule 25 (b) (1) (providing, inter alia, that appellee's brief "shall point out any material inaccuracy or incompleteness of appellant's statement of facts and any additional statement of facts deemed necessary, plus such additional parts of the record or transcript deemed material").

[13] *Bryson v. State*, 228 Ga. App. 84, 85-86 (2, 3) (491 SE2d 184) (1997) (holding that "the order of revocation must be vacated and the case remanded to the

3. Orr challenges various other aspects of the revocation order. Orr complains that the court ordered confinement until a date certain and for a set number of days. Orr also complains that the order included the language: "remit the case allowing probation to FIFA the balance." Given our holding in Division 2, vacating the entirety of the order of revocation and remanding the case with direction, these complaints are moot.

Finally, Orr complains that the order was entered without the trial court having given him opportunity "to offer evidence in mitigation as to what was the proper consequence of any finding of a violation of probation." However, the transcript of the revocation hearing shows that Orr and his counsel were present throughout the revocation hearing; that as part of closing argument, Orr's attorney *did* propose modifying, as opposed to revoking, Orr's probation, in the event that the court determined that Orr had violated a probationary condition; and that Orr never sought

trial court for the entry of a findings of fact and judgment authorized by the evidence," where defendant correctly asserted that a written finding was unsupported by the evidence, even though the trial court did not err in determining that defendant had violated the terms of his probation in the manner alleged); see generally *Johnson v. State*, 307 Ga. App. 570, 572-573 (707 SE2d 373) (2011) (reversing probation revocation and remanding case for further proceedings, where trial court committed reversible error in revoking defendant's probation for failure to pay court-ordered fines and fees).

13

to, but was disallowed from, presenting any such mitigation evidence during the hearing. Thus, we find no basis for Orr's complaint, and it establishes no trial court error.

*Judgment vacated and case remanded with direction. Ellington, C. J., and Dillard, J., concur.*